Bernard PRESS, Plaintiff,

v.

MARVALAN INDUSTRIES, INC., et al., Defendants.

No. 75 Civ. 2645.

United States District Court,
S. D. New York.

May 27, 1976.

Paul R. Scott, New York City, for plaintiff.

Kantor, Shaw & Davidoff, P. C., New York City, for defendant TDA Industries, Inc.; Donald H. Shaw, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

Plaintiff, Bernard Press, seeks a preliminary injunction prohibiting the sale of shares of stock of White Lamps, Inc. ("White"), and TDA Industries, Inc. ("TDA") which are owned by the plaintiff and held by TDA, one of the defendants herein, as collateral security for the payment of a promissory note. The defendants have cross-moved to vacate the temporary restraining order presently in effect. Jurisdiction is founded on diversity of citizenship, 28 U.S.C. § 1332.

A narrative of the facts is essential to an understanding of the motion. On August 1, 1974, Bernard Press executed a Purchase Agreement with TDA and White. Under the terms of the agreement Press acquired 19.15% of the outstanding common stock of White. Prior to that time TDA had been the sole shareholder of White. The price for the shares was $100,000 of which $75,-000 was paid in cash. Plaintiff executed a non-negotiable promissory note for the re-maining $25,000. The note by its terms was subject to the Purchase Agreement. It was agreed that the White stock would be held by TDA as collateral for the note, together with $25,000 worth of TDA stock also owned by Press.

The Purchase Agreement granted plaintiff the right of first refusal to purchase shares of White sold by TDA. The Agreement further provided that Press was to be elected President and a member of the Board of Directors of White and would be given a 37 month employment contract.

In early December 1974, TDA notified plaintiff of its intentions to sell all of its remaining shares of White to Marvalan Industries, Inc. ("Marvalan"). Apparently, the terms of the sale were advantageous to the principals of Marvalan, Andrew Greystoke, Alexander Kogan, Jr., and Marvin Gersten, each of whom is named with Marvalan as a defendant. Press indicated his intention to exercise his right of first refusal. The principals of Marvalan began negotiating with Press to obtain his waiver of that right.

On or about December 16, 1974, an understanding was arrived at under which Press would receive 25% of the stock of Marvalan, a $5,000 payment, and a more advantageous employment agreement with White in return for the waiver of his right of first refusal. A formal agreement incorporating these provisions was to be executed.

As a precondition to the Press-Marvalan agreement, it was necessary that Press obtain the return of his White shares from TDA. Plaintiff agreed with TDA on December 21, 1974 that TDA would cancel the Purchase Note and return the White stock to plaintiff in return for plaintiff's TDA shares which were also held by TDA as collateral security. It was understood that this agreement between TDA and Press was subject to the Marvalan transaction with Press.

On January 2, 1975, plaintiff alleges that he indicated to the Marvalan principals that he would be unwilling to waive his right of first refusal unless and until a written agreement was executed. Press also claims

that at that time they promised that a written agreement would be entered into when he returned from a trip on January 10, 1975, provided that Press executed a release of his right of first refusal in time for the January 6, 1975 closing. Press states that in reliance upon this understanding he executed a waiver of his right of first refusal.

With these preliminary problems seemingly worked out, the TDA-Marvalan closing was scheduled for January 6, 1975. An attorney allegedly selected and paid for by Marvalan represented Press at the closing. Immediately prior to the closing, Press gave his consent telephonically and telegraphically.

As part of the closing TDA and Press, through his attorney, entered into an escrow agreement whereby the promissory note of Press and the shares of White Lamp would be turned over to Press in exchange for the TDA stock held by TDA and mutual releases. The note, the White and TDA shares, and releases from White and TDA were turned over to an escrow agent to await a general release from Press to TDA. If the release was not delivered to the escrow agent within two weeks, the note, stock and releases were to be returned to the attorney for TDA and White.

According to the allegations of the complaint, Press returned from his trip on January 10 and discovered that the terms of the Marvalan-TDA transaction differed materially from those contained in the notice of sale. He alleges that he attempted to get the Marvalan principals to execute the written agreement as promised but that his requests were refused. On or about January 16, 1975, Press advised TDA that in light of Marvalan's failure to execute its agreement with him, he would not go through with the escrow arrangement.

It was on January 20, 1975, that Press first learned of TDA's position that he was in default on the August 29, 1974 note. Press received a letter dated January 17, 1975, from TDA which notified him that in light of his failure to pay the required $195.83 interest on January 1, the due date

for the month, or during the ten day grace period which followed, he was in default and the entire principal and interest was immediately due. On January 20, 1975, Press mailed the interest check to TDA with the following note:

"In view of the fact that it appears as though the escrow arrangement has been terminated, attached is my check for payment of interest for the month of January on a note you are holding."

The check was returned by TDA by letter of January 22, 1975, in which it insisted that Press was in default.

On February 1, Press mailed the monthly interest check for January and February. The checks were returned.

By letter dated February 20, Press attempted to exercise his right to prepay all the principal on the note, together with interest accrued to March 4, 1975. The letter stated that payment would be made at the office of Press's attorney at a stated time. TDA did not attempt to pick up the payments and now maintains that it had no obligation to do so.

Subsequently, TDA notified Press that it intended to sell the collateral as a result of the default unless Press tendered payment of principal and interest plus $2,500 in costs and attorney's fees. Three days before the scheduled sale Press brought on this motion for a preliminary injunction by order to show cause.

This action against TDA, Marvalan and their principals alleges, among other things, fraud on the part of Marvalan with regard to its intentions to enter the proposed Press-Marvalan agreement, breach of the original purchase agreement between Press and TDA, breach of fiduciary duties on the part of the directors of White, and breach of his employment agreement with White. For the purposes of this motion only the sixth and seventh causes of action which relate to the question of default on the note are in issue.

The note, itself, requires payment of interest on the first day of each month. The consequences of default are clearly defined:

"If any interest payment shall not be paid when due or within ten days thereafter, then the principal amount of this note shall immediately become due and payable at the option of the legal holder hereof, without any additional notice or demand. Failure to make full payment of the principal sum of this note with accrued interest shall constitute a default hereof."

While there is no dispute that the interest was not paid on January 1, 1975 or within ten days thereafter, the plaintiff's theory seems to be that the obligation to pay interest was suspended while the note was in escrow. If such were true, then the January 20 and February 1 attempts at payment would be proper tenders. In the alternative, plaintiff claims that the February 20 offer of prepayment was valid.

■ New York law is silent as to the obligation to pay interest on a promissory note which is held in escrow. It does appear, however, that the incidents of ownership remain in the person depositing the property into escrow until the conditions of the escrow agreement are fulfilled. *Alexander v. Quality Leather Goods Corp.*, 150 Misc. 577, 269 N.Y.S. 499 (Sup.Ct.1934) (seller who deposits corporate shares in escrow to await payment of promissory notes is entitled to all rights of a shareholder); *Clark v. Campbell*, 23 Utah 569, 65 P. 496 (1901) (dividend on shares held in escrow belongs to the seller who deposited the shares in escrow and not to the buyer). I am persuaded that there is nothing in the law governing escrow agreements which would, in and of itself, suspend the obligation to pay interest on the note.*

Thus, if a waiver of interest is to be found it must arise from the statements or other conduct of the parties. In setting forth the facts surrounding the December 21, 1974 arrangement with TDA, Press states in his affidavit that "[t]here never was a discussion or demand by TDA in connection with said agreement as to the payment of any interest for the month of January 1975," but concludes that "interest was being waived by TDA as part of said agreement." If there were no discussions with regard to January interest, then it is difficult to conceive how an alleged oral contract could contain a waiver of that interest.

■ A claim of oral or "implied by conduct" waiver cannot succeed. The original promissory note is expressly subject to the terms of the purchase agreement. That agreement contains a merger clause which would bar the use of parole evidence to establish plaintiff's claim. In addition, the agreement contains a prohibition against waivers or modifications except by a signed writing.

■ Since no written waiver is claimed and there is nothing contained in the note or the escrow agreement which could be construed as suspending the obligation to pay interest, it follows that Press was in default on the note. The tender of February 1 and the prepayment offer of February 20 can in no way alter that conclusion.

While Press may or may not have valid claims against TDA and the other defendants, there is no valid basis for enjoining the sale of the collateral.

The motion for a preliminary injunction is denied. The motions to vacate the temporary restraining order and to require a bond are therefore moot.

Settle order on seven days' notice.

---

* To have a valid escrow agreement under New York law there must be (a) an agreement as to the subject matter and delivery of the instrument; (b) there must be a third party depository; (c) there must be delivery of the instrument to a third party which is subject to the performance of some act by the depository upon the happening of some event; and (d) relinquishment by the grantor.
*Menkis v. Whitestone Savings & Loan Assoc.*, 78 Misc.2d 329, 356 N.Y.S.2d 485 (D.C., Nassau County 1974).