Bernard PRESS, Plaintiff,

v.

MARVALAN INDUSTRIES, INC., Andrew Greystoke, Alexander Kogan, Jr., Marvin Gersten, White Lamps, Inc., Douglas Fields, Frederick Friedman, Mercia Danas and TDA Industries, Inc., Defendants.

75 Civ. 2645 (KTD).

United States District Court,
S. D. New York.

March 28, 1979.

Louis C. Pulvermacher, P. C., New York City, for plaintiff.

Jeffrey M. Atlas, New York City, for defendant Marvin Gersten.

Donald H. Shaw, New York City, for defendants TDA Industries, Inc., et al.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Plaintiff, Bernard Press, has brought this action to redress certain grievances which he claims resulted from the sale of stock in defendant White Lamps, Inc. [hereinafter

referred to as "White"], by its parent corporation defendant TDA Industries, Inc., [hereinafter referred to as "TDA"], to defendant Marvalan Industries, Inc. Also named as defendants are Douglas Fields, Frederick Friedman and Mercia Danas, officers of TDA, as well as Andrew Greystoke, Alexander Kogan, Jr., and Marvin Gersten, officers and directors of Marvalan. The complaint charges that certain of the defendants breached their employment contract with Press and that the aforementioned sale of stock was accomplished pursuant to the false representations of defendants upon which plaintiff relied to his detriment.

Defendants Fields, Friedman, Danas, TDA and Gersten have all moved, pursuant to Fed.R.Civ.P. 41(b), to dismiss the complaint for plaintiff's failure to comply with my order directing that a proposed pretrial order be filed by October 11, 1978. Plaintiff finally filed the proposed order on December 19, 1978, three weeks after the matter had been set down for trial. The same defendants have also moved, pursuant to Fed.R.Civ.P. 56, for summary judgment on the ground that the material facts are not in dispute and they are entitled to judgment as a matter of law.

Defendants Fields, Friedman, Danas and TDA filed their motion to dismiss two weeks before the scheduled trial date, with a return date of November 21, 1978, five days before trial. On November 19, 1978 the same defendants filed a massive summary judgment motion. The effect of this motion was to postpone the trial date to give plaintiff an opportunity to respond and to give the Court an opportunity to review the papers.

This case is not presented in a simple factual posture: Defendants' statement of facts is made in a seventy page affidavit with thirty-eight numbered exhibits annexed thereto. In addition, there are many references to deposition testimony which is voluminous. Thus, I do not doubt that the task of preparing a proposed pretrial order

was not an easy one. This fact, however, does not excuse plaintiff's failure to ask permission to delay filing his pretrial statement. The Court and litigants alike are inconvenienced, and may even be prejudiced, when time restrictions are ignored. However, I am not inclined to dismiss this case based upon delay alone. Much effort has gone into the preparation of the matter which was filed three years ago. Moreover, defendants' own motion for summary judgment has resulted in an adjournment of the trial. Finally, to the extent that plaintiff's belated pretrial statement raises issues that are not set out in the complaint, defendants have been given ample opportunity to respond thereto. Thus, they have not been severely prejudiced by the delay. In sum, while I do not in anyway condone plaintiff's dilatory tactics, I do not believe the drastic punitive measure sought by defendants is appropriate.

Turning to the motion for summary judgment, the following facts are before me. On August 29, 1974, plaintiff purchased from TDA 1.915 shares of White stock (representing 19.15% of its shares), for which he agreed to pay $100,000. $75,000 was paid in cash and the remaining amount was represented by a non-negotiable promissory note payable in twelve months bearing interest at 9.4% per annum. As collateral for the note, plaintiff pledged his White shares, as well as 59,000 shares of TDA common stock owned by him. Interest payments were to be tendered on the first of each month, but not later than the tenth, at TDA's office. The Purchase Agreement also provided that plaintiff was to have (i) the right of first refusal to purchase TDA's shares of White upon the same terms and conditions as offered to TDA by any purchaser;[1] and (ii) the right to require White Lamps to repurchase plaintiff's White Lamps shares if TDA sold all of the remaining shares. (This was known as his right to "put" his shares to White)[2] Plaintiff was elected president and a director of White and en-

---

1. Affidavit of Donald Shaw, November 10, 1978, Exhibit 1, at p. 9.

2. *Id.*, Exhibit 3.

tered into an employment agreement with White for a period of 37 months. The salary specified in the Employment Agreement itself was $36,000 for the first year.[3] Plaintiff claims that this amount was later changed to reflect a salary of $41,600. This is a point of dispute between the parties. All concede, however, that the employment agreement was to terminate in the event of default on the aforementioned promissory note.[4] The agreement also provided that plaintiff would be reimbursed for his commuting and/or moving expenses until such time as he relocated to the New York metropolitan area (plaintiff was and is a Massachusetts resident).

Prior to the closing of this arrangement, plaintiff attempted to secure a salary increase. According to Press, defendant Friedman agreed to a $41,600 salary for the life of the contract with the proviso that in the first year Press would return to TDA $5,200 out of any profits he realized as a result of his ownership of the White Lamp stock. Friedman denies agreeing to this change. A letter was prepared reflecting an amendment to the agreement very similar to that understood by plaintiff but providing for the $41,600 salary in the second year of the contract, rather than the first. The letter was prepared twice: the first[5]

draft contained an obvious error with respect to the repayment of dividend moneys. Plaintiff claims that when this error was corrected[6] the other error regarding the date of his salary increase was left unchanged in an attempt to defraud him of his rightful salary. At any rate, Press instructed White's bookkeeper to pay his salary at the $41,600 rate and he continued to receive this amount until December of 1974.

In the Fall of 1974, defendants Greystoke and Kogan apparently became interested in purchasing White. On December 6, 1974 Greystoke and Kogan together with defendant Gersten met to discuss the proposed sale of TDA's shares in White. The plan was to use assets of White to finance the acquisition so that very little of their own cash would be required. The sum of $200,000 was to be borrowed from Ambassador Factors secured by White's assets and Greystoke and Kogan's personal guarantees. Defendants also hoped to reach an agreement with Press to avoid the financial strain that would occur if he exercised his put. Additionally, they sought to have Press waive his right of first refusal so that the transaction could close without having to wait the thirty days he would ordinarily have to exercise it.[7]

3. *Id.*, Exhibit 4.

4. *Id.*, Exhibit 1, at pp. 17, 19.

5. *Id.*, Exhibit 8.

6. *Id.*, Exhibit 9.

7. The right of first refusal was set forth as follows:

Upon the closing of this transaction, the Seller shall also grant to the Buyer a right of first refusal with respect to any subsequent proposed sale by the Seller of any of the remaining shares of capital stock of the Company owned by the Seller, so long as Buyer continues to own any shares of the Company, but in no event beyond August 31, 1979. During this period, if the Seller shall desire to sell any further shares of the capital stock of the Company then owned by the Seller, the Seller shall notify the Buyer of such proposed sale and, within a period of 30 days following the date of such notice, the Buyer shall have a right to acquire such further shares upon the same terms and conditions as have been or are proposed to be offered by the Seller to

the prospective independent third-party purchaser. If, in the event that such notice is given to the Buyer and the Buyer either fails to exercise his right of first refusal within such 30 days or notifies the Seller that he does not wish to accept such offer by a written communication addressed to the Seller, then such right of first refusal with respect to such specific sale shall terminate and the Seller may proceed to effect such sale to the proposed third-party purchaser. This right of first refusal shall terminate effective August 31, 1979. Any proposed sale by Seller of further shares of the Company for a consideration not expressed in dollar amounts shall for the purpose of this Section 6.3 be deemed to be made at a price equivalent to the Net Tangible Book Value of the number of further shares proposed to be sold and Buyer may exercise the right to purchase such further shares by making payment of the purchase price by cashier's or bank check in an amount equal to the aggregate Net Tangible Book Value for such further shares.

In order to avoid the possibility that Press would exercise his put, Marvalan, the corporation formed by Greystoke, Kogan and Gersten, offered to buy less than all the outstanding shares of White, that is 8.075 instead of 8.085. Press was notified of the proposed sale by letter dated December 6, 1974. Plaintiff claims that the terms of this sale were inequitable because, among other reasons, they provided for the financing of the purchase price by the use of White's own assets in which plaintiff had a 20% interest.

On December 9th, the Marvalan group met with Press and defendant Fields at TDA's office. Press was handed a copy of the December 6th letter as well as a supplementary letter dated December 9th which provided that the purchase price of White shares would be reduced if the book value of White went down as of the closing. Press had apparently been attempting to arrange the financing necessary to exercise his right of refusal and, by meeting with him, defendants were seeking to head off this effort.

On December 16, 1974, Press, Kogan and Gersten agreed to a plan whereby Press would waive his right of first refusal and contribute his White stock to Marvalan in exchange for 25% of Marvalan stock, $5,000 and an advantageous employment agreement. Marvalan also apparently agreed to provide an attorney for him and pay all his legal expenses.[8]

None of the drafts memorializing this agreement were ever signed. Apparently, the scheduled closing date was adjourned until January 2, 1975. However, on that date Marvalan declined to execute the proposed agreement. Greystoke, speaking on behalf of the corporation, advised Press that he had learned of Press' salary dispute

with TDA and of the fact that Press had refused to follow defendant Friedman's instructions to roll back the salary Press had ordered the bookkeeper to pay him. Friedman ordered this action taken in December, 1974 when he first learned of Press' alleged excesses. Greystoke also expressed his belief that because Press' right of first refusal had almost run, it was of little value. Greystoke did state, however, that he would consider entering into an agreement if, after investigating the charges, it appeared that Press had not acted dishonestly.

Thereafter Press departed for a trade show in Chicago. Before going, however, he furnished his lawyer with a power of attorney and general release, dated January 2, 1975, to close the transaction as he understood it. According to Press his agreement with Marvalan was settled and he executed the release in reliance upon Marvalan's assurance that it would, in fact, be consummated. Press asserts that he instructed his attorney to exchange releases with TDA only if this condition was met.

On January 6, the closing date of the TDA/Marvalan transaction, Press was telephoned in Chicago. Press was advised that the purchase price of the White shares had been reduced to $150,000 to be paid at the closing and $50,000 payable over the next four months. It is also asserted by defendants that they told him all the White shares were being sold. Press, however, has claimed that the communication was confused and that his understanding of what was to transpire was at odds with defendants' intent. For instance, defendants requested that he execute a new release specifically relinquishing his right of first refusal and right to put his stocks to White for repurchase. They also asked him to release them by telegram, which he did.[9]

---

8. The attorney retained for plaintiff was a personal friend of defendant Gersten and presently his law partner.

9. The telegram read as follows:
Gentlemen This will confirm my verbal consent to the consummation of a transaction dated January 6, 1975 between TDA Industries, Incorporated, White Lamps, Incorporated and Marvalan Industries, Incorporated relative to the purchase by Marvalan Industries, Incorporated of 8.085 shares of White Lamps Inc. and the promissory note of White Lamps Inc. held by TDA Incorporated and its subsidiaries on the terms outlined to me in telephone conversations of this date. I fur-

However, according to Press, he understood that the release was to be placed in escrow and only relinquished at the conclusion of his negotiations with Marvalan.

Because they did not yet have a second general release from Press, defendants decided to close the TDA/Marvalan deal in escrow. A two week escrow period was provided and the deal closed.

When Press returned from Chicago, he claims to have learned for the first time the true state of affairs. In mid-January, Press' attorney became aware that whether or not Press signed the second release, the first release together with the telegram release would be delivered to TDA. Accordingly, he decided to commence an action to reform the escrow agreement in State Court. He also sought to enjoin delivery of the January 2nd release pending the outcome of the action. A temporary restraining order was entered on January 20, 1975.

On January 17, 1975 TDA notified Press that he was in default on his Purchase note for failure to pay interest thereon. On his attorney's advice, Press had not paid that interest, since both believed that the note was to be returned at the end of the escrow period in accordance with the arrangement Press and Marvalan had worked out. When notified of the default, Press attempted to tender the interest but was rebuffed.

Thereafter, on January 21, 1975, Press attended a directors meeting of White Lamps. His attorney was present and he was advised that by reason of Press' default, his employment agreement was null and void. The meeting was adjourned until January 27, 1975 at which time Press was confronted with a copy of a report that defendant Kogan had compiled. The report

indicated that Press had been drawing unauthorized salary, had used White funds for personal living expenses, had tried to block Marvalan's acquisition of stock by paying White bills in advance of their due date and thus depleting the net assets, and in general had managed the company poorly. Press denied the charges. The Marvalan defendants then terminated his employment, although they did provide him the opportunity to present evidence at the next meeting to substantiate his claim that he was entitled to a first year salary of $41,600. On February 7, the date of the next meeting, Press presented a letter repudiating the action of the Board, asserting that his note was not in default, that the termination of his employment was wrongful and that he intended to repay the note within thirty days and exercise his put. He designated March 4, 1975 as the date of the closing with respect to this exercise and the prepayment.

During this flurry of activity, TDA briefly removed Press' New York State action to this Court. TDA argued that it was not fair to temporarily enjoin the delivery of the January 2nd release while permitting Press to threaten exercise of the very put TDA claimed was released. This Court temporarily enjoined Press' exercise of his put to White and set down the matter for a hearing on March 14. The case was ultimately remanded to the State Court.

In the meanwhile, on March 4, Press waited for TDA and/or Marvalan to come to his attorney's office to exchange the White Lamps' stock, TDA stock and note upon receipt of $25,000. No one appeared.[10]

---

ther confirm that I shall reexecute the form of release read to me by my counsel, Jack Scherer, Esq. upon my return as soon as practical. I hereby waive notice of a meeting of White Lamps Inc. to be held January 6, 1975 at the offices of Borden and Ball, 345 Park Avenue, New York, New York for the purpose of electing 3 additional directors to fill vacancies created on this date and for the purpose of electing additional officers to fill vacancies created on this date and to take such steps as may be necessary to implement

the transaction described above and outlined to me relating to the purchase of White Lamps shares. I reaffirm my waiver of any rights against TDA Industries, Incorporated.

Bernard Press

10. The TDA defendants contend that the note should have been prepaid at it's office while Press contends it was payable anywhere. See Non-Negotiable Promissory Note, Affidavit of Donald H. Shaw, November 10, 1978, Exhibit 2.

On April 11, 1975, TDA gave Press notice of its intention to sell the collateral for Press' note. Press instituted the instant action on June 3rd and obtained a temporary restraining order enjoining the sale of the collateral. On October 9, 1975, the State-issued TRO was vacated and the January 2nd release held in escrow was turned over to defendants. Thereafter I vacated the TRO restraining the sale of collateral. After examining the facts and the case law, I found nothing to suggest that Press' obligation to pay interest has been suspended and that, since Press was in default on the note, the collateral therefor could be sold. *Press v. Marvalan Industries, Inc.*, 422 F.Supp. 346 (S.D.N.Y.1976). On June 25, 1975, the stock was sold to Fields for $10,000 and Press was discharged from further liability for unpaid principal due under the note. Shortly thereafter, White Lamps filed a petition for reorganization under Chapter XI of the Bankruptcy Act.

Press contends that the Marvalan defendants falsely and fraudulently represented to plaintiff that they would enter into an agreement with him in order to secure his waiver of the right of first refusal and his consent to the TDA/Marvalan transaction. He further charges that the TDA defendants conspired with the Marvalan defendants to deprive plaintiff of prior written notice of the true terms and conditions of the TDA/Marvalan transaction. This, according to Press was a breach of the purchase agreement between him and TDA. Press' third claim is that the TDA/Marvalan transaction was actually a scheme to deplete White's assets and, as a result, plaintiff's interest therein. This was allegedly a breach of the fiduciary duty of the defendants both as directors and majority shareholders in White. The fourth claim is that the TDA and Marvalan defendants conspired to cause White to breach its employment agreement with Press, while the fifth claim charges White and the Marvalan defendants with unlawfully terminating Press' employment agreement. The sixth claim is that the defendants conspired to induce White and TDA to breach their agreement to allow Press to prepay his Purchase Note.[11]

The TDA defendants, on this motion, assert that TDA could not have interfered with his right of first refusal since Press was advised on January 6, 1975 of the terms of the Marvalan/TDA transaction and did not offer to duplicate them. They also argue that TDA did not interfere with Press' exercise of his put since the stock which he sought to put to White was at all times in escrow as security for the note which was in default. Nor, according to TDA, did they conspire with Marvalan to wrongfully terminate Press' employment agreement since it was terminable for cause in the sole discretion of the Board of Directors. Finally, the TDA defendants assert that TDA cannot have wrongfully conspired with Marvalan regarding the financing of the TDA/Marvalan transaction since Press consented thereto. Defendant Gersten joins in the motion of the TDA defendants and adds that summary judgment is appropriate because (i) he did not make a promise to Press with a preconceived intention not to perform and (ii) Gersten at all times acted within the scope of his authority as an officer and director of Marvalan and as such was immune from liability for actions taken by those companies.

At the outset, I should note that although the factual underpinnings of this case are long and set forth in a somewhat convoluted fashion, there is no reason why summary judgment, if appropriate, may not be awarded. *Compare American Manufacturers Mutual Ins. Co. v. American Broadcasting Co.*, 388 F.2d 272, 280 (2d Cir. 1967). Rule 56 is a useful tool to pierce conclusory pleadings and dispose of unsupportable claims prior to trial. *See generally Dressler v. M V Sandpiper*, 331 F.2d 130 (2d Cir. 1964); 6 Moore's Federal Practice at 56–64.

---

11. The complaint also charged that TDA wrongfully declared Press' Purchase Note to be in default and sought to enjoin the sale of the collateral held for that Note. This contention was disposed of by my Opinion dated May 22, 1976. *Press v. Marvalan Industries, Inc.*, 422 F.Supp. 346 (S.D.N.Y.1976).

Of course, the moving party carries the burden of clearly establishing the absence of any genuine issue of material fact and all doubts should be resolved in favor of the non-moving party. *Securities and Exchange Commission v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978). However, if the facts in issue are not material to the central dispute there may be no reason to deny summary judgment. *See Applegate v. Top Associates, Inc.*, 425 F.2d 92 (2d Cir. 1970).

The papers accompanying this motion are voluminous, and perhaps because of their very volume, somewhat difficult to decipher. After sifting through and digesting the contentions of the parties, however, I am convinced that at least some of the claims are amenable to summary disposition. In the interest of clarity I will proceed in order of Press' claims, dealing first with the allegations against the TDA defendants and then with those against defendant Gersten.

■ Plaintiff's second cause of action charges the TDA defendants with interfering with his right of first refusal by failing to give plaintiff the required prior notice of the true terms and conditions of Marvalan's purchase of White shares. The TDA defendants assert that no such interference can be claimed since Press knew all the terms, did not attempt to duplicate them and in fact waived his right of first refusal.

While there is no doubt that Press signed a consent to the sale of White stock to Marvalan,[12] there is a very real question as to the nature of this consent and whether he understood all the terms of the TDA/Marvalan transaction. Press contends that his releases were to be held in escrow pending the culmination of his negotiations with Marvalan. He also claims that his conversations with defendants were confused and that his understanding of the underlying transaction was limited. It is his position that he signed the releases with the proviso that if the Press/Marvalan deal fell through, his consent to the TDA/Mar-

valan transaction would fall with it. This view of the facts is at odds with that of the TDA defendants who claim that the releases were to be delivered regardless of the status of Press' arrangement with Marvalan.

The only certainty which emerges from this discrepant treatment of the facts is that summary judgment on this claim is inappropriate. To resolve the issue, I will require further evidence and credibility will undoubtedly play a role in the outcome of the dispute. Accordingly, the motion of the TDA defendants with respect to the second claim must be denied.

■ Press also charges that the TDA/Marvalan transaction was a scheme to deplete White assets by causing it to incur high interest rates and subordinate its accounts receivable and inventory to a factor. According to Press, the directors' actions constituted corporate waste and a breach of their fiduciary duty both to the corporation and to plaintiff as a minority shareholder. However, even if the facts are as Press alleges, the primary injury is to the corporation and not to him. Accordingly, the remedy lies with a shareholder's derivative action and a stockholder cannot proceed individually even though he may be injured by a diminution of the value of his shares. *Berzin v. Litton Industries*, 24 App. Div.2d 740, 263 N.Y.S.2d 485 (1st Dep't 1965). Since Press has not proceeded by a derivative suit, his claim cannot be sustained and defendants are entitled to summary judgment on the third cause of action.

■ Press' next claim is that the TDA defendants conspired with the Marvalan defendants to cause the breach of his employment agreement. It is apparently his contention, although none too clearly articulated, that TDA wrongfully declared his note to be in default and maliciously advised the Marvalan defendants of the salary dispute, both of which acts caused the employment of Press to terminate. I have already determined that by virtue of Press' failure to pay interest, his note was in default. *Press*

---

**12.** Shaw Affidavit, Exhibits 21, 22, 23.

*v. Marvalan Industries, Inc.*, 422 F.Supp. 346, 349 (S.D.N.Y.1976). This in turn acted as an automatic termination of TDA's employment agreement with Press. Press has cited no law or precedent to alter my view in this regard. There is thus no support for Press' position that the note was wrongfully declared in default and that his employment agreement was thereby breached.

Nor is there anything to suggest that the TDA defendants acted maliciously or with an intent that Press' employment contract be terminated in advising Marvalan of the salary dispute. Although Press has pleaded malicious interference in his complaint, he has set forth no facts to support this allegation. In the face of defendants' denial of wrongful intent, Press may not stand mute and expect to forestall summary judgment. Moreover, it is difficult to perceive how notification of the salary dispute by the TDA defendants can be deemed wrongful when Press himself notified the Marvalan defendants of the dispute prior to the time when Friedman advised them thereof.[13] Accordingly, this claim cannot withstand attack and defendants are entitled to summary judgment thereon.

Press' final claim with respect to the TDA defendants is that they interfered with his right to require White to repurchase all his White shares and breached the terms of his purchase note. According to plaintiff, the TDA defendants, by refusing to appear at Press' attorney's office on March 4, 1975 and permit prepayment of his note, prevented Press from forcing White to repurchase his stock. In other words, the first step toward exercising Press' put was the repossession of his White shares held in escrow as security for his note.

The TDA defendants recite a number of reasons why their actions did not constitute interference with Press' put. In the first place, they argue that Press had released his put on January 2 and January 6, 1975. The effect of these releases, however, is a question in dispute, as previously noted. Thus, these releases may not be relied upon for a grant of summary judgment. The

TDA defendants also argue that Press never tendered payment for the note and thus he could not tender the shares to White. According to defendants, tender for the note could only take place at TDA's offices and they were not required to appear at any other location designated by Press. In response to this argument, Press for the first time suggests that a tender at TDA's offices would have been futile. The affidavit of his attorney reflects an alleged conversation with TDA's attorney to the effect that neither plaintiff's note nor the collateral held by TDA would be delivered to plaintiff. Additionally, based upon what had transpired between Press and the TDA defendants to date, it would not be unreasonable for Press to assume that TDA would not have accepted payment even if tendered at its office. In any event, whether or not tender would have been futile is a factual question and thus not amenable to summary disposition.

The TDA defendants also argue that they could not have interfered with Press' put because it had been enjoined. This argument, of course, does not explain why the underlying transaction, that is, the prepayment, could not have gone forward. Indeed, because of the interrelation of the two transactions, and the confusing manner in which they are treated in the motion papers, I am unwilling to grant defendants' motion on this issue.

■ I turn now to the motion of Marvin Gersten. It is his position that he is entitled to summary judgment on the first, fourth, fifth and sixth claims. Plaintiff's first claim is that the Marvalan defendants deceived him into releasing his valuable rights by making a promise they never intended to keep. This promissory fraud, according to Gersten, does not exist in a case where the only promise made was that Marvalan would enter into an agreement with Press if the charges against him proved to be groundless. In fact, Press charges the Marvalan defendants with an intention not to perform from the inception of their ne-

---

**13.** Deposition of Bernard Press at 262–3.

gotiations, notwithstanding the outcome of the investigation. "[A] contractual promise made with the undisclosed intention not to perform it constitutes fraud." *Sabo v. Delman*, 3 N.Y.2d 155, 162, 164 N.Y.S.2d 714, 718, 143 N.E.2d 906, 909 (1957). However, since defendant Gersten has challenged the factual basis for Press' allegations of promissory fraud, it is incumbent upon Press to come forward with specific facts to indicate that the Marvalan defendants had no intention of performing their agreement. This he has utterly failed to do. Press was questioned at his deposition as to the facts which indicated Marvalan's fraudulent intentions. He answered that the agreement had not been signed before he left for Chicago and that this failure was indicative of Marvalan's intention not to enter the agreement. Press Deposition at 769. Actionable fraud, however, depends on more than mere non-performance. *Perma Research and Development Co. v. Singer*, 410 F.2d 572, 576 (2d Cir. 1969). Press has pointed to no facts which would suggest that even if Marvalan's investigation of his salary dispute had had a favorable conclusion, the defendants would not have entered into the agreement. Press has merely rested on his unsupported allegations which will not suffice to defeat a motion for summary judgment. *See Dressler v. M V Sandpiper*, 331 F.2d 130 (2d Cir. 1964). Accordingly Gersten's motion on count one is granted.

Gersten also seeks summary judgment on the fourth, fifth and sixth causes of action. He argues that he cannot be held accountable on these claims because he was at all times acting within the scope of his duties as an officer and director of both Marvalan and White Lamps and is thus entitled to immunity.

Press' fourth claim charges Gersten and the other defendants with wrongfully inducing White to breach its employment agreement with him. The fifth cause of action charges that Gersten, Greystoke and Kogan, as the majority of White's Board of Directors, unlawfully terminated Press' employment agreement. Press' sixth claim charges Gersten and others with inducing White Lamps and TDA to breach the purchase agreement and purchase note.

As I have indicated earlier in this opinion, Press, by virtue of his failure to pay interest on the Purchase Note, was in default on this obligation. As a result his employment by White automatically terminated. Press has nowhere suggested that any of the defendants told him his interest obligation was suspended during the course of their negotiations. Indeed, it appears that the only person who did discuss the January interest with him was his own attorney.[14] Thus, Press' own actions gave rise to the termination in question and his claim that his employment contract was wrongfully breached does not appear to be sustainable.

Gersten argues that, in any event, he cannot be held accountable for inducing the breach of any contract between Press and White because officers or directors who act in good faith and for the best interests of the corporation may not be held liable for inducing the corporation to breach its contractual relations. *Greyhound Corporation v. Commercial Casualty Insurance Co.*, 259 App.Div. 317, 19 N.Y.S.2d 239 (1st Dep't 1940). This, of course, assumes that Gersten was acting in good faith and for the benefit of the corporation. Press suggests otherwise, claiming as he does that defendants' sole interest was in their own personal finances and that they intended to milk White of its assets. To achieve this end defendants allegedly entered into a scheme to deprive Press of his valuable right to put his shares to White. Thus, whether these actions were taken in the corporation's best interest is a question of fact which, of course, cannot be resolved by summary judgment. Accordingly, Gersten's motion regarding the sixth claim is denied. His motion on Press' fourth and fifth claim is granted.

14. While it is true that this attorney was paid by Marvalan and was a friend of Gersten, Press has not charged him with collusion in the scheme to terminate Press' rights. Nor am I willing to imply such a scheme in the absence of a pleading and concrete facts.

For the foregoing reasons the motion of the TDA defendants for summary judgment is granted with respect to Press' third and fourth claims only. Defendant Gersten's motion is granted with respect to the first, fourth and fifth claims only. The motions with respect to the remaining claims are denied.

Settle judgment on ten days' notice. No costs are to be allowed.