**99 COMMERCIAL STREET, INC., Martin Kennedy and Clark McLain, Plaintiffs,**

v.

**Gary H. GOLDBERG and Gary Goldberg & Company, Defendants.**

No. 92 Civ. 2879 (SS).

United States District Court, S.D. New York.

Jan. 14, 1993.

Alan Cohen, O'Melveny & Meyers, New York City, for plaintiffs.

Stephen Rinehart, Parker, Chapin, Flattan & Klimpl, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

SOTOMAYOR, District Judge.

Defendants' motion presents the question of whether plaintiffs may be required to arbitrate claims under a brokerage agreement signed by an escrow agent. Controlling principles of arbitration, escrow, and agency law lead to the conclusion that plaintiffs may be so required and, therefore, this Court grants Defendants' request for an order, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, to compel arbitration and stay this action.

### I. *Background*

Plaintiffs 99 Commercial Street, Inc. ("99 Commercial"), a developer of real estate in New York City, and its principals Martin Kennedy ("Kennedy") and Clark McLain ("McLain") (together, "Plaintiffs") commenced this action against Gary Goldberg & Co. ("GG & Co."), a securities broker-dealer, and its president Gary H. Goldberg ("Goldberg") (together "Defendants"), seeking to recover compensatory damages for claims arising under, *inter alia*, § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and punitive damages under 18 U.S.C. § 1961 *et seq.*

Plaintiff 99 Commercial and its principals claim that Defendants made a series of fraudulent misrepresentations that induced them to invest mortgage proceeds in three funds that Defendants managed or owned: MFS Government Market Income Trust and MFS Intermediate Income Trust (together the "MFS Funds") and VMS Mortgage Investment Fund (the "VMS Fund") (together "the Funds"). Plaintiffs assert that through a pattern of securities fraud and racketeering activity, Defendants siphoned principal and interest from their investment. In this proceeding, Defendants have moved to compel arbitration of Plaintiffs' claims.

### II. *Facts*

An abbreviated narrative of the facts is helpful in clarifying the issues raised by Defendants' motion.

The underlying events began when Kennedy and McLain mortgaged their homes and a building located at 99 Commercial Street with Liberty Credit Corporation ("LCC") in order to raise $1.3 million to acquire a property (the "Property") adjacent to the building.

Before the mortgages closed, Kennedy and McLain sought advice from Goldberg on how to invest the mortgage proceeds while they waited for the Property to become available for purchase. They asked Goldberg to recommend "safe, conservative and liquid short-term assets" because they had mortgaged the full value of 99 Commercial and their homes. Plaintiffs confided to Goldberg that they had no investment experience with securities and that they would rely exclusively on him. Goldberg recommended that they invest

the mortgage proceeds in the MFS and VMS Funds by depositing the proceeds with Defendants' clearing house, Bear Stearns & Co. ("Bear Stearns").

The closing followed, and, in accordance with Defendants' instructions, McLain deposited $1 million of the mortgage proceeds with Bear Stearns (hereinafter the "Commercial Account"). Defendants have not produced a customer agreement for the Commercial Account but have proffered evidence that when an account is opened, Bear Stearns routinely sends to clients an executed customer agreement containing an arbitration clause. Plaintiffs deny receiving the agreement.

LCC and Plaintiffs also placed $100,000 of the mortgage proceeds in escrow with Steckler, Gutman, Morrisey & Murray ("Steckler & Gutman"), attorneys for LCC, in order to secure completion of certain conditions that had been required but were not completed at the closing (hereinafter the "Escrow Account"). The escrow agreement specified that the escrow monies would be held by the escrow agents in "one or more interest bearing account [sic] with the interest for your [99 Commercial's] benefit. All the interests earned on the funds escrowed [sic] [would] remain in escrow and [would only] be paid upon completion of the matter for which the funds were escrowed [sic]." In their papers to the Court and at oral argument, Plaintiffs admit that they were told about and approved the placement of the escrow monies with Bear Stearns.

Partners of Steckler & Gutman, acting as escrow agents, signed a customer agreement with Bear Stearns ("the "Customer Agreement") for the Escrow Account about a week after the Commercial Account was opened. Although the partners signed the Customer Agreement using their own names, the account name was "FBO (for the benefit of) 99 Commercial St Inc" in all of Bear Stearns records.

In portions relevant to this matter, the Customer Agreement expressly incorporates GG & Co. as a third-party beneficiary. It provides that "You [the customer] agree that your broker [Goldberg & Co.] is a third party beneficiary of this Agreement, and that the terms and conditions hereof, *including the arbitration provision, shall be applicable to all matters between or among any of you, your broker or Bear Stearns."* (Emphasis added).

The Customer Agreement further provides that:

> You [the customer] agree, and by maintaining an account for you Bear Stearns agrees, that controversies arising between you and Bear Stearns *concerning your accounts or this or any other agreement with Bear Stearns,* whether entered prior to, on or subsequent to the date hereof, shall be determined by arbitration.

(Emphasis added).

The Escrow and Commercial Accounts were invested in the MFS and VMS Funds, whose values then dropped precipitously. Kennedy and McLain grew less confident in Goldberg's investment advice and this led to the closing of the accounts and the commencement of this action.

### III. *Positions of the Parties*

Defendants move to compel arbitration of all of plaintiffs' claims citing the terms of the Customer Agreement signed by the escrow agents. Defendants maintain that Plaintiffs are the owners of the Escrow Account and, therefore, are bound by the Customer Agreement to arbitrate any disputes with them as brokers. Defendants argue that Plaintiffs are also compelled to arbitrate disputes arising from the Commercial Account because the plain language of the Customer Agreement requires arbitration of all disputes arising from any account with Bear Stearns owned by them even if it was opened before the Customer Agreement was signed. In the alternative, Defendants claim that a contract to arbitrate disputes involving the Commercial Account is implied in law because Bear Stearns routinely sent customer agreements containing an arbitration clause to clients when accounts were opened and Plaintiffs implicitly accepted the agreement by accepting and retaining

the benefits of Bear Stearns' clearing services.

Although Plaintiffs concede that they authorized the placement of the escrow funds with Bear Stearns, they contest the assertion that they owned the account. Instead, they claim that either the escrow agents or LCC, but not 99 Commercial, owned the escrow account at the time escrow agents executed the Customer Agreement. Consequently, only LCC, or the escrow agents themselves, could be bound to arbitrate disputes with Defendants.

Plaintiffs emphasize that they never authorized the escrow agents to execute a customer agreement on their behalf. Moreover, there is no evidence that Plaintiffs, in contrast to the escrow agents, ever saw the Customer Agreement until the commencement of this litigation. Plaintiffs also deny ever receiving an executed customer agreement for the Commercial Account.

Plaintiffs point out that Defendants' reliance upon cases in which contracts to arbitrate have been implied in law is misplaced, because those cases involve situations in which a party, either during a transaction or in past transactions, had received a contract containing an arbitration clause and its course of conduct evinced an intent to be bound by the contract. Plaintiffs argue that parties such as themselves cannot be compelled to arbitrate disputes when they (1) never saw the agreement containing the arbitration clause; (2) never authorized the signing of such an agreement and never had a relationship with the party seeking to enforce the arbitration agreement from which one could infer a course of conduct evincing an intent to be bound to arbitration.

There is no dispute in this case that GG & Co., as a third-party beneficiary explicitly referenced in the arbitration clause of the Customer Agreement, can move to compel arbitration of its disputes with other parties to that Agreement. *See, e.g., Port Chester Electrical Construction Corp. v. Atlas,* 40 N.Y.2d 652, 655, 389 N.Y.S.2d 327, 330, 357 N.E.2d 983, 985–86 (1976); *see also Cauble v. Mabon Nugent & Co.,* 594 F.Supp. 985, 991–92 (S.D.N.Y. 1984). Moreover, because "acts by employees of one of the parties to a customer agreement are equally arbitrable as acts of the principals as long as the challenged acts fall within the scope of the customer agreement," *see Scher v. Bear Stearns & Co., Inc.,* 723 F.Supp. 211, 216 (S.D.N.Y. 1989) and cases cited therein, those claims asserted against Goldberg that arose in the context of his activities as President of GG & Co. are arbitrable. Similarly, the claims of McLain and Kennedy—which arose in the context of the activities of 99 Commercial—are arbitrable if 99 Commercial is a party to an arbitration agreement. The central issue in this case, therefore, is whether the Customer Agreement signed by the escrow agents can bind 99 Commercial to arbitrate disputes involving either the Escrow Account or the Commercial Account or both. In order to address this issue, the Court must examine applicable principles of arbitration, escrow, and agency law.

### IV. *Discussion*

#### A. Arbitration Principles

Reversing decades of hostility towards alternative methods of dispute resolution, the Federal Arbitration Act (the "Act"), 9 U.S.C. § 1 *et seq.,* enacted on 1947, heralded a new era of explicit federal policy in favor of arbitration. *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Article 2 of the Act makes agreements to arbitrate "valid, irrevocable, and enforceable...." 9 U.S.C. § 2. Thus, parties seeking to compel arbitration of disputes pursuant to an agreement may request an order compelling arbitration. *See* 9 U.S.C. § 4; N.Y.C.P.L.R. § 7503(a). Doubts as to whether an issue is within the scope of an arbitration clause must be resolved in favor of arbitration. *See Moses H. Cone Memorial Hosp.,* 460 U.S. at 24–25, 103 S.Ct. at 941.

■ None of this implies that every case involving an agreement that contains an arbitration clause must be referred whole-

sale to arbitration. Instead, the Act merely requires courts to enforce agreements to arbitrate in accordance with their terms. *Prima Paint Corp. v. Flood & Conklin MFG. Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967). Arbitration is first and foremost a matter of contract and a party "cannot be required to submit to arbitration a dispute he has not agreed to so submit." *McAllister Brothers, Inc. v. A & S Transportation Co.*, 621 F.2d 519, 522 (2d Cir.1980); *see also Volt Information Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 478, 109 S.Ct 1248, 1255, 103 L.Ed.2d 488 (1989) ("[T]he [Act] does not require parties to arbitrate when they have not agreed to do so").

■ Courts faced with motions to compel arbitration must, at the outset, determine whether the parties have entered into a binding contract to arbitrate. *Continental Group v. NPS Communications, Inc.*, 873 F.2d 613, 617 (2d Cir.1989).

■ In determining whether a party is bound by an agreement to arbitrate, courts apply general principles of contract and agency law:

> It does not follow ... that under the [Act] an obligation to arbitrate attaches only to one who has personally signed that written arbitration provision. For the Act contains no built-in Statute of Frauds provision but merely requires that the arbitration provision itself be in writing. Ordinary contract principles determine who is bound by such written provisions and of course parties can become contractually bound absent their signatures. It is not surprising then to find a long series of decisions which recognize that the variety of ways in which a party may become bound by a written arbitration provision is limited only by generally operative principles of contract law.

*Fisser v. International Bank*, 282 F.2d 231, 233 (2d Cir.1960); *see also McAllister Brothers*, 621 F.2d at 522. Thus, neither the Act nor principles of arbitration law changes the applicability of escrow and agency law in determining whether a party is bound to arbitrate under an agreement.

## B. Escrow Principles

Understandably, both parties spend considerable time and effort analyzing who controlled or owned the escrow account in order to prove on whose behalf the escrow agents were acting when they executed the Customer Agreement. Citing *Stein v. Rand Construction Co.*, 400 F.Supp 944, 948 (S.D.N.Y.1975) and *Asher v. Herman*, 49 Misc.2d 475, 477, 267 N.Y.S.2d 932, 934 (N.Y.Sup.Ct.1966), Defendants argue that all indicia point to ownership and control of the account by 99 Commercial. Not surprisingly, Plaintiffs assert that the escrow account was owned by the mortgagor, LCC. They cite *Press v. Marvalan Indus., Inc.*, 422 F.Supp. 346, 349 (S.D.N.Y.1976) for the proposition that under escrow law, LCC retained ownership of the funds until the conditions of the escrow were satisfied. Because Plaintiffs conclude that the Customer Agreement was executed while ownership remained with LCC, they argue that 99 Commercial is not bound by the arbitration clause.

■ Neither party is entirely correct. *Both* parties to an escrow agreement own the escrow account for purposes of acts that an escrow agent undertakes in accordance with the terms of the escrow agreement.

■ An escrow is generally defined as a written instrument entrusted by a grantor to a third party agent or trustee who, in accordance with instructions, subsequently delivers the instrument to the grantee once certain conditions are met. *Silberstein v. Murdoch*, 216 A.D. 665, 215 N.Y.S. 657 (1st Dept.1926); *see generally* 28 AmJur2d *Escrow* § 3. "[A]n escrow is controlled by the escrow agreement." 30A C.J.S. *Escrow* § 3; *George A. Fuller Company v. Alexander & Reed, Esqs.*, 760 F.Supp. 381, 385 (S.D.N.Y.1991); *Press*, 422 F.Supp. at 349; *Farago v. Burke*, 262 N.Y. 229, 232, 186 N.E. 683, 684 (1933). Escrow agreements are contracts that ensure performance of prior obligations between parties. *Animalfeeds Intern, Inc. v. Banco Espirito Santo E. Commercial De Lisboa*, 101

Misc.2d 379, 382, 420 N.Y.S.2d 954, 957 (N.Y.Sup.Ct.1979); 55 N.Y.Jur. § 2.

■ Any loss suffered before the condition for delivery is satisfied is borne by the depositary or grantor—in this case, LCC. "[T]he incidents of ownership remain in the person depositing the property into escrow until the conditions of the escrow agreement are fulfilled." *Press,* 422 F.Supp. at 349, *citing Alexander v. Quality Leather Goods Corp.,* 150 Misc. 577, 269 N.Y.S. 499 (N.Y.Sup.Ct.1934). By contrast, any loss incurred after the condition is met falls on the grantee—in this case, 99 Commercial. *See* 30A C.J.S. §§ 3, 5. None of this supports plaintiff's suggestion that an agreement executed by an escrow agent prior to compliance with the conditions set forth in the escrow agreement is enforceable only against a grantor like LCC. Once funds or documents are deposited with the escrow agent, the grantor loses control over the instruments, and the grantee does not obtain title until the condition is satisfied. *Press,* 422 F.Supp. at 349. In a very real sense, ownership is held in stasis, the instrument available neither to grantor nor grantee, awaiting disposition by the agent in accordance with the terms of the agreement. Absent dissolution of the trust by consent of both parties, abandonment of a claim against the trust, violation of a condition by the grantee, or compliance with the conditions, the escrow continues in effect. 28 AmJur2d *Escrow* § 11.

■ In complying with its fiduciary duties, an escrow agent must follow the instructions of the parties, *Farago,* 262 N.Y. at 233, 186 N.E. 683; 55 N.Y.Jur.2d, *Escrows* § 19; 30A C.J.S. § 10, and is bound to take whatever steps are necessary to fulfill its duties. *Helman v. Dixon,* 71 Misc.2d 1057, 338 N.Y.S.2d 139 (N.Y.Civ. Ct.1972). Moreover, an agreement entered into by an agent pursuant to authority granted by the agency agreement or by instruction of the parties is valid and enforceable. 30A C.J.S. § 10. The escrow agent is, in effect, agent to both parties, *see George A. Fuller Company,* 760 F.Supp. at 386; *Asher,* 49 Misc.2d at 477, 267 N.Y.S.2d at 934; and *Farago,* 262 N.Y.

at 233, 186 N.E. at 684, and holds the instruments for both parties. Accordingly, the escrow agent acts for both parties and, by definition, on behalf of both parties.

The final question, therefore, becomes whether the Customer Agreement executed by the escrow agents was within the scope of the agents' fiduciary duties and whether the authority granted by the parties was sufficient to bind them to an arbitration agreement that the escrow agents signed.

### C. Agency Principles

■ It is axiomatic that agents with proper authority can enter into contracts with third persons on behalf of their principals. 2A C.J.S. *Agency,* § 174. Whether an agent has authority to enter into a contract with a third party is determined "from all the facts and circumstances of the case, in view of the object which the agent is appointed to accomplish." *Id.* Written consent is not necessary; the principal's spoken words or general conduct suffices, particularly when they lead the agent to conclude that the principal desires that the agent act in a particular way. Restatement (Second) of Agency § 26 (1958).

■ Under New York law, an agent's authority may be express, implied or apparent. An agent enjoys implied authority to enter into a transaction when verbal or other acts by a principal reasonably give the appearance of authority to the agent. *Greene v. Hellman,* 51 N.Y.2d 197, 204, 433 N.Y.S.2d 75, 80, 412 N.E.2d 1301, 1306 (1980). In apparent authority cases, the words or conduct are communicated to a third party so as to lead the third party to believe that the agent acts with authority granted by the principal. *Ford v. Unity Hosp.,* 32 N.Y.2d 464, 472–73, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659, 663 (1973). Reliance on implied or apparent authority is acceptable so long as it is reasonable from the circumstances surrounding the transaction. *See, e.g., Di Russo v. Grant,* 28 A.D.2d 847, 281 N.Y.S.2d 513, 514 (2d Dep't 1967).

On the basis of the above principles of law, this Court concludes that the escrow agents in this case executed the Customer Agreement in accordance with their duties, binding both 99 Commercial and LCC to arbitration and permitting the Defendants to rely on the Agreement to bind the Plaintiffs.

It is undisputed that after consulting with Defendants, McLain opened the Commercial Account with Bear Stearns. It is also undisputed that, at all times, Plaintiffs were aware that the monies would be placed at Bear Stearns for investment in the Funds recommended by Defendants. The escrow agents, complying with the instructions of the escrow agreement and with Plaintiffs' explicit consent at the closing, invested the escrow funds with Bear Stearns. As part of the investment process, the escrow agents signed the Customer Agreement. The escrow agreement undeniably authorized the investment of the escrow funds and Plaintiffs acquiesced in the placement of the monies with Bear Stearns. There is nothing in the record to suggest that a customer agreement containing an arbitration clause with a clearing house is unusual or out of the ordinary course of business for the securities investment world. In fact, the evidence proves the contrary. Bear Stearns routinely sends customer agreements containing an arbitration clause when accounts are opened. The agent's acts in executing the Customer Agreement were eminently reasonable and fully within the scope of the duties which they were entrusted to execute. The escrow agents had both express and apparent authority to act on behalf of both 99 Commercial and LCC and could and did bind both to the arbitration provision of the Customer Agreement. Thus, the Plaintiffs must submit their Escrow Account claims to arbitration.

As to the Commercial Account, Plaintiffs are correct that the cases cited by the Defendants are distinguishable from the facts of this case. There simply has been a dearth of persuasive evidence presented that Plaintiffs either received an executed customer agreement for the Commercial Account or that they engaged in a course of dealing sufficient to suggest a contract implied in law. Nonetheless, Plaintiffs must also submit their Commercial Account claims to arbitration because the Escrow Account Customer Agreement explicitly requires arbitration of disputes involving all of a customer's accounts "whether entered prior to, on or subject to the date hereof." The escrow agents acted for Plaintiffs and the plain meaning of the agreement they signed for Plaintiffs binds the Plaintiffs to arbitration of *all* of their account transactions with Bear Stearns and their brokers, regardless of when an account was opened. *See, e.g., Coffey v. Dean Witter Reynolds, Inc.,* 891 F.2d 261, 262–63 (10th Cir.1989); *Belke v. Merrill Lynch, Pierce, Fenner & Smith,* 693 F.2d 1023, 1028 (11th Cir.1982).

### V. *Conclusion*

The agreement executed by Plaintiffs' escrow agents binds Plaintiffs to arbitration. Therefore, Defendants' motion for an order to compel arbitration and to stay this action until the termination of arbitration proceedings pursuant to 9 U.S.C. § 3 is hereby GRANTED. The parties are, however, required to submit status reports on the progress of the arbitration every six months. The first report is due on July 7, 1993.

SO ORDERED