Jacob Markowitz, J.
This is an interpleader action. Plaintiff, a stakeholder, held a fund to the credit of Passport Fashion, *4 Ltd., one of the defendants. The fund, which amounts to $40,-665.74, has been paid into court. Claims thereto have been received from the other defendants to this action. Plaintiff seeks determination of the respective claims, discharge and costs, disbursements and counsel fees.
The matter has been submitted substantially on an agreed statement of facts.
Passport (now inactive) was engaged in the business of selling, ladies’ ready-to-wear garments at retail. During* 1967 its sole supplier was defendant 0. Itoh & Co. (America), Inc., an importer of Japanese goods. On January 23, 1967 Passport signed a “ Security Agreement (Trust Receipt) ” whereby it, as ‘ ‘ trustee ’ ’, acknowledged receipt of ‘ ‘ the documents listed on the obverse hereof representing the goods therein specified (which, together with all improvements or additions to or accessories .to or products of such goods, are all hereinafter called ‘Collateral’), and * * * the existence of * * * a security interest in favor of [Itoh] in the Collateral.”
The parties hereto have stipulated that the reference to the ‘ ‘ documents listed on the obverse ’ ’ was intended to refer to various delivery receipts and invoices delivered by Itoh to Passport. In fact, however, no such documents were listed or attached to the security agreement.
The security agreement gave Itoh the right to accelerate all indebtedness owed by Passport if Itoh considered itself ‘ ‘ insecure ’ ’.
On March 29, 1967 Itoh filed financing statements, executed by Passport and Itoh, with the New York Department of State and the New York City Register. These statements indicate that they cover: “Ladies’ Dresses, Sweaters, Suits, Slacks, etc. individual or sets, made of various types of fabric ” and “ proceeds ”.
Passport apparently factored its account receivables with Itoh’s knowledge, and the fund involved in this action is the result of one of these factoring arrangements.
On August 31, 1967 Itoh notified Passport that pursuant to the provisions of the security agreement, it deems itself “ insecure ” and declared all liabilities thereunder to be accelerated. This resulted in a further agreement between the two under which payment of the balance owing was arranged, but ‘ ‘ without affecting the validity and enforceability” of the security agreement and other agreements referred to.
In addition to the parties mentioned, claim is made to portions of the funds on deposit by the United States Government and two judgment creditors of Passport. The parties have *5 stipulated as to the order of payment in the event Itoh’s claim of a paramount security interest fails.
It is established that from the inception of the dealings between Itoh and Passport up to March 29, 1967 orders totaling $743,572.68 were placed and accepted. As of that date, Itoh had shipped $262,274.75 worth of goods under these orders and received payment of $62,969.90.
It is also stipulated that the $40,665.74 on deposit with this court is entirely attributable to sales made after the date of the security agreement.
Therefore, unless the security agreement is valid and covers deliveries beyond those received by Passport on or before January 23,1967 (after-acquired property) there is no merit to Itoh’s claim that it has a secured lien.
By its terms the security agreement created a security interest for “ any and all liabilities * * * direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising.” As indicated, the documents upon which this interest was founded and which would have described it were not attached. The parties stipulated that the security agreement was intended to apply to orders in existence when the agreement was executed, ‘1 and subsequent continuing transactions and to all sales of Itoh’s goods made by Passport after January 23. 1967.”
The rules governing ‘1 after-acquired property ’ ’ are set forth in section 9-204 of the Uniform Commercial Code. Subdivision (3) of section 9-204 provides: “ (3) Except as provided in subsection (4) a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement.”
Subdivision (4) does not affect the transactions at bar.
Consequently, if the security agreement is valid and if the intent of the parties to the security agreement, inter se, governs, Itoh is entitled to judgment.
If, however, the security agreement is defective or the intent of the parties, inter se, does not apply to the third-party claimants of the fund, Itoh may not recover.
The third-party claimants contend that the security agreement is defective in that it fails to satisfy the requirements of paragraph (b) of subdivision (1) of section 9-203 of the Uniform Commercial Code. Paragraph (b) of subdivision (1) of section 9-203 of the Uniform Commercial Code provides that a security interest is unenforceable against the debtor or third parties unless ‘ ‘ the debtor has signed a security agreement which contains a description of the collateral ’ ’.
*6 It is mandated by the statute that the Uniform Commercial Code be liberally construed and applied to promote its underlying policies with respect to simplification, clarification and modernization of the law governing commercial transactions and encouragement of the continued expansion of commercial practices through custom, usage and agreement (Uniform Commercial Code, § 1-102). Also, insofar as secured transactions are concerned, a description is sufficient ‘ ‘ whether or not it is specific if it reasonably identifies what is described.” (Uniform Commercial Code, § 9-110.)
This, apparently, is a departure from prior law, which held descriptions to be insufficient unless they were of the most exact and detailed nature (53 NT. Y. Jur., Secured Transactions, § 127).
Under the code, a description of the collateral need not be specific; it may be a blanket or general description so long as identification is possible (N. Y. Jur., Secured Transactions, § 128).
Under the law prior to the adoption of the code, the description of property intended to be mortgaged could be set forth in another instrument referred to in the mortgage (Edgell v. Hart, 9 N. Y. 213). There is nothing in the code which suggests that this rule of law does not apply to code transactions.
In relation to a chattel mortgage, it was also held that parol evidence was admissible, even as against a third person, for the purpose of applying an ambiguous description to the facts of a particular case (Conkling v. Shelley, 28 N. Y. 360).
In the case before me, there was attempted compliance with article 9 of the Uniform Commercial Code (Secured Transactions), but for some unexplained reason, the documents, incorporated by reference in the security agreement, which would have described the property to be covered, were not attached.
These were not documents which never existed, but documents which did exist, but through some inadvertence, were never attached to or listed in the main instrument.
While the content of these documents has now been shown by stipulation, I am satisfied that by reason of their absence from the security agreement, a reasonable inquirer, upon reviewing the security agreement, with or without the financing statement, would not have had revealed sufficient information to provide an adequate description of the collateral. Reading the financing statement or the security agreement, alone or together, does not provide sufficient information from which a searcher could determine what funds in the hands of the factors were earmarked to preserve a preferred creditor position for Itoh.
*7 The security agreement is therefore not enforceable, as creating a secured transaction, insofar as third parties are concerned.
As between themselves, the intention of the original parties might be controlling. It does not, however, bind those who would have been unable to ascertain the facts after reasonable investigation of the recorded instruments and the document they refer to.
Particularly is this so in respect to after-acquired property. The .security agreement does not, in so many words, say that it applies to deliveries made after its date. Possibly, between the parties to the agreement, the ambiguous provision to the effect that it creates a security interest for “ 'any and all liabilities * * * now existing or hereafter arising ” might be found, on parol testimony, to mean that it does apply to subsequent deliveries; and, between the parties to the agreement, the court might well have so found. But so to find where third-party claimants to the fund are involved would be to stretch its language beyond what is reasonable and beyond what is just.
Judgment is accordingly awarded discharging plaintiff as a stakeholder (defendants having waived claim of interest on the fund prior to its deposit in court in consideration of plaintiff’s waiver of all claims to counsel fees and disbursements) and directing that the fund on deposit be distributed in accordance with the stipulation of the parties in the event Itoh was not granted judgment.
(Amendment of July 5,1971)
Upon the court’s own motion, the decretal paragraph of the decision of June 28, 1971 is amended to read:
“Judgment is accordingly awarded discharging plaintiff as a stakeholder (defendants having waived claim of interest on the fund prior to its deposit in court in consideration of plaintiff’s waiver of all claims to counsel fees and disbursements) and directing that the fund on deposit be distributed in accordance with the stipulation of the parties in the event Itoh was not granted judgment.”
Settle judgment accordingly.