EUROPEAN AMERICAN
BANK, Plaintiff,

v.

The **ROYAL ALOHA VACATION CLUB, the Royal Aloha Partners, the Aloha Group, Inc., Royal Aloha Associates, Limited, Marina Development Corporation, ITT Commercial Finance Corporation, Southwest Mortgage Service Corporation, and Bobby L. Pringle, Defendants.**

No. 87 Civ. 2154 (RWS).

United States District Court,
S.D. New York.

Jan. 11, 1989.

Schulte Roth & Zabel, New York City, for plaintiff European American Bank; Roger B. Mead, Jeffrey K. Cymbler, of counsel.

Fennemore Craig, Phoenix, Ariz., for defendants Royal Aloha Vacation Club, Royal Aloha Partners, Aloha Group, Inc.; John G. Ryan, Ray K. Harris, of counsel.

John E. Collins, Dallas, Tex., for defendant Bobby L. Pringle.

## OPINION

SWEET, District Judge.

Plaintiff European American Bank ("EAB"), the present holder of certain installment notes, interpleaded pursuant to 28 U.S.C. § 1335 defendants Royal Aloha Vacation Club (the "Club"), the Royal Aloha Partners (the "Partners"), The Aloha

Group, Inc. (the "Group"), Royal Aloha Associates, Limited ("RAA"), Marina Development Corporation ("Marina"), ITT Commercial Finance Corporation ("ITT"), Southwest Mortgage Service Corporation ("Southwest"), and Bobby L. Pringle ("Pringle") to determine the present entitlement to the notes worth over $2 million. Upon the trial and all the prior proceedings, in accordance with the following facts and conclusions, judgment will be entered in favor of Club with costs and disbursements. EAB's motion for fees and disbursements also is granted.

The issues here present a case study of the vacation time sharing industry and its attendant problems. At stake are the rights of those claiming interests in the notes members of the public uttered to pay for their membership in Club, which was to provide them with vacation time and space at resort locations. Millions of dollars in cash, debt, and contract obligations were paid over in the course of the events recounted below. Perhaps the paramount consideration underlying the conclusions reached is the desire to protect the integrity of the vacation plan, which seeks to provide the bargained for sun and surcease for Club members.

*Prior Proceedings*

EAB commenced this action on July 20, 1987 and promptly bonded its performance to hold the notes at issue and their proceeds. On December 29, 1986, Group and Partners sued ITT in the Southern District of New York (Docket No. 86 Civ. 9890 (RWS)), and this case was consolidated with the EAB interpleader action on September 16, 1987. In addition, Group, Partners, Club, and Pringle filed cross claims against ITT in the EAB interpleader action.

Discovery proceeded. Group, Partners, and Club settled their claims against ITT prior to trial. ITT did not assert any claim against the interpleaded property at trial. Pringle, however, asserted by crossclaim rights in the ITT Notes. A motion for a default judgment extinguishing the claims of Southwest and RAA was granted and entered on June 20, 1988.

The action was tried before the court beginning on September 12, 1988 and finally submitted on October 21, 1988.

*The Parties*

EAB is a New York banking corporation with its principal place of business in New York. EAB held the installment notes (and their proceeds) at issue as pledged to secure a loan that was repaid August 22, 1986.

Club is a Hawaii nonprofit corporation with its principal place of business in Honolulu, Hawaii. It was formed in 1977 to own and manage vacation time share condominium units for the use of Club's members.

Partners is a Nevada limited partnership with its principal place of business in Palm Springs, California. Group is a Hawaii corporation with its principal place of business in Palm Springs, California. Group and Donald W. Eastvold, Sr. ("Eastvold"), a citizen of California, are the general partners of Partners. Group and Partners were the initial promoters and developers of the plan to offer Club vacation time shares to the public.

Marina is a Nevada corporation with its principal place of business outside New York.

RAA is a Nevada limited partnership with its principal place of business outside New York. Marina and Partners formed RAA in March 1982, with Marina as general partner and Partners a limited partner, intending to take over the duties Group and Partners previously performed. Joe T. Boyd ("Boyd") sought to acquire the rights and obligations of RAA. Marina has not appeared in this action. Boyd is bankrupt.

ITT is a Nevada corporation with its principal place of business in St. Louis, Missouri.

Southwest is a Texas corporation with its principal place of business in Texas. Southwest filed a petition for bankruptcy under Chapter 11 of the Bankruptcy Code on April 14, 1984 in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division). On July 29, 1987, the Bankruptcy Court terminated the automatic stay as it pertains to this

action. Southwest has appeared in this action but has not made a claim against the interpleaded property.

Pringle is a citizen and resident of Texas. Pringle claims the interpleaded property on the basis of an assignment to him from Boyd, Southwest, and RAA.

*The Facts*

In 1977, Eastvold devised a plan to offer the public time share units in Hawaii. Club was formed in Hawaii to hold and administer the vacation units that Club members would occupy. At the beginning, Group and Partners sold Club memberships pursuant to a development agreement with Club.

As Club memberships were sold, Group and Partners customarily received only a portion of the purchase price in cash. The unpaid balance of the purchase price was evidenced by the purchaser's installment note payable to Group or Partners ("Member Note"). Certain of these Member Notes are at issue here.

In 1978, it was determined that Club would separate from Group and, in the words of its president Kenneth Griffin ("Griffin"), "stand alone." The Development Agreement was signed as of January 1, 1979 under which the developer sold Club memberships, received cash and Member Notes for the membership, and acquired real estate interests to be transferred to Club to provide the vacation units that Club members would occupy. An Escrow Agreement initially was entered into with Tellus Financial Services, Inc. ("Tellus"), which provided that the Member Notes would be sent to Tellus and accounts would be set up determining the amounts necessary to service any debt on the properties assigned to Club. The Escrow Agreement sought to insure that facilities would be available to meet Club members' demands and that any debt incurred in connection with the facilities would be funded.

On August 22, 1980, Group and Partners entered into a contract with Club (the "De-

velopment Agreement") under which Group and Partners had (a) the right to sell Club memberships and (b) the duty to transfer vacation time share condominium units to Club as memberships were sold.

On August 27, 1980, Group and Partners executed a Security Agreement, Assignment, and Pledge of Notes to Club. This security agreement granted Club a security interest in Member Notes "together with all additions, substitutions, renewals, extensions or proceeds thereof" to secure the obligations of Group and Partners under the Tellus Escrow Agreement "and all renewals, modifications or extensions thereof." As Club memberships were sold, Group and Partners customarily received only a portion of the purchase price in cash. The unpaid balance of the purchase price was evidenced by Member Notes payable to Group or Partners. Approximately 40% of the membership payment was in cash, and this initial down payment was less than the cost of sale, thus requiring a continued development drive.

The Development Agreement provided that "proceeds from those installment notes receivable generated from sales of Club memberships ... shall be assigned and maintained by Group and Partners for the account of the Club" to secure an amount equal to 110% of any encumbrances on the real estate interests transferred to Club. Contemporaneously with the Development Agreement, Club, Group, and Partners entered into an agreement (the "Tellus Escrow Agreement") under which Tellus as escrow agent held and collected the Member Notes assigned to Club and paid encumbrances on Club units to perform Group's and Partners' obligation under the Development Agreement.

On June 1, 1981, Group, Partners, and Club replaced the Tellus Escrow Agreement with an Escrow Agreement under which the Bank of California would act as escrow agent (the "Escrow Agreement"). This Escrow Agreement subsequently was amended by a First Amendment to Escrow Agreement dated August 24, 1982.[1] Under

---

**1.** This amendment was not a model of clarity, adding and substituting new provisions in a way

that required the student of the Escrow Agree-

the Escrow Agreement, as amended: (a) the Bank of California was to service all Member Notes generated by Club membership sales and (b) Club was assigned a security interest in certain Member Notes to secure payment of encumbrances on the vacation time share condominium units Group and Partners transferred to Club. Paragraphs 10(a), 11(a), 11(b), 13(a), 13(b), 26, 39, 44(a)(i) provide as follows:

10. *Pledge of Note Proceeds.*

(a) Group shall be responsible for payment of all Obligations, and, as and for security for payment by Group, Group shall, at the time of transfer of any Apartment Unit, assign to Club proceeds of, and all sums due or to become due under certain Notes (hereinafter referred to as "Coverage Notes") to secure Group's promise to pay obligation(s), as defined herein, on each Transferred Unit in the manner and amount as provided below.

11. *Procedure for Meeting Unit Requirements and Maintaining Coverage.*

(a) *Transfer and Assignment.* Within ten (10) business days of the date of notice to Group from Escrow Agent, pursuant to Paragraph 12 below that one or more additional integral multiples of 48 Use Weeks of Regular Memberships and 3 Use Weeks of Special Memberships for 2–Bedroom, 1–Bedroom or Studio Memberships, respectively, have been sold or are issued and outstanding to Members in Good Standing (as that term is defined in the bylaws of the Club), Group will make a transfer to Club of an appropriate 2–Bedroom, 1–Bedroom or studio Apartment Unit, as the case may be, and grant a security interest in, and pledge by instrument in substantially the form of the attached Exhibit "B" (the Security Agreement) to the Club, or its designee, the proceeds of Coverage Notes in substantially the form attached hereto as Exhibit "C", or such other form approved by Club, that contain terms and have an aggregate principal balance sufficient to Maintain Coverage, as defined

ment to review both the initial agreement and

below, with respect to each of the Transferred Units. Such Notes shall be delivered to Escrow Agent to hold as agent for Club.

(b) *Maintain Coverage.* In order to Maintain Coverage:

(i) *100%.* The Coverage Notes must have aggregate principal balances equal to, or greater than, 110% of the amount necessary to pay all Obligations on the Transferred Unit; and,

13. *Application of Proceeds of Notes.*

(a) *Payment Priorities.* So long as Group is not in Default with respect to its obligations hereunder, or under the Security Agreement (a "Default"), the Coverage Note proceeds which have been assigned to Club shall be collected by Escrow Agent for account of Club, except as hereafter provided in the event of prepayment of principal payments called for under such Coverage Notes. Upon a Default by Group, the proceeds of Coverage Notes, and all other Notes not then assigned or otherwise encumbered, shall be collected by Escrow Agent for the account of Club until such time as the Default has been cured. Regardless of for whose account the Coverage Notes, Third Party Notes or any other Notes in this escrow are being collected, the proceeds of such Notes collected by Escrow Agent shall be applied by Escrow Agent in the following priority:

.     .     .     .     .

(b) *Final Proceeds.* When all Obligations on Transferred Units are fully paid, any remaining proceeds in the hands of escrow Agent shall revert to (i) Group, if no Default on the part of the Group has occurred and is continuing; or (ii) Club, if Default by Group, has occurred and is continuing.

26. *Power of Attorney.* Group hereby irrevocably appoints Escrow Agent as its true and lawful attorney-in-fact, in its name, place and stead, and for its use and benefit to segregate and perfect security interests in Notes owned by Group, as allocated and authorized by Group from time to time in the posses-

the amendment.

sion of Escrow Agent (except on any which Escrow Agent, or any prior Escrow Agent, has acknowledged in writing that it is collecting to satisfy or secure a claim of a third party), and assign them and pledge the proceeds thereof to Club as additional security. If, at any time, Group fails to Maintain Coverage, Escrow Agent shall exercise this power of attorney and shall have full power and authority to do so and perform all and every act and thing whatsoever requisite, necessary and incidental or convenient to the accomplishment and exercise of the foregoing power without any further authorization from Group, as fully and to all intents and purposes as Group might or could do if personally present, and Group hereby ratifies and confirms all that Escrow Agent shall lawfully do, or cause to be done, by virtue of this power of attorney. It is understood and agreed that the foregoing power of attorney is coupled with an interest, and shall survive any assignment by Group of its rights hereunder, and nothing herein contained shall require any person to investigate the authority of said attorney-in-fact to sign any instrument executed pursuant to the authority of this power of attorney. This power of attorney shall terminate upon termination of escrow agent as Agent hereunder, and shall automatically be granted to any successor appointed as Escrow Agent hereunder.

39. *Release of Notes.* If Group notifies Club and Escrow Agent that it has terminated sales of memberships and Club discontinues sales for one (1) year thereafter, then Escrow Agent shall annually release to Group or its assignee any excess Notes from this escrow, and Club shall release its security interest in those Notes. The term "excess notes" shall mean those notes in excess of the Notes whose proceeds are required to be assigned to Club in order for Group to satisfy its obligation to Maintain Coverage, but shall not require the release of any Notes which are needed to satisfy any other obligations of Group to Club. The first release of Notes shall occur on the first business day of the twelfth

(12th) month commencing after termination of sales, and subsequent releases shall be on the same day each and every year thereafter. If, at any time after termination of sales, the proceeds of Notes assigned hereunder are insufficient to Maintain Coverage, however, Group, on demand shall immediately assign proceeds of sufficient additional notes to cash to Maintain Coverage.

Group and Partners were thereby obligated to "maintain coverage" by assigning to Club the proceeds of Coverage Notes with outstanding principal balances of 110% of the outstanding obligations on Club units, and the Bank of California held the Coverage Notes (or Member Notes) as Club's agent. In the event of a breach of the Escrow Agreement, the proceeds of all Member Notes not otherwise encumbered were to be collected for Club's benefit.

To the extent the Bank of California held Coverage Notes in excess of the amount required under the Escrow Agreement, Group and Partners could pledge those excess Member Notes to secure business under the Development Agreement provision, which provides:

(d) Any installment notes receivables remaining whose proceeds have not been assigned to provide the 100 percent coverage or such greater amount necessary to fully amortize payment of the encumbrances as above mentioned shall be available for whatever use by Group and/or Partners.

In December 1981, the Bank of California was instructed to treat all Member Notes generated by Club membership sales as Coverage Notes and not to transfer Coverage Notes if a deficiency (failure to "maintain coverage" under the Escrow Agreement) would result. The parties also referred to the Coverage Notes as "mortgage support" notes.

In February 1981, Greyhound Real Estate Finance Corporation provided Group and Partners a $3,000,000 line of credit secured by a pledge of certain Member Notes, and in July 1981 ITT Diversified Credit Corporation ("ITT Diversified") provided Group and Partners a $3,000,000 line

of credit secured by a pledge of certain Member Notes.

The ITT Business Financing Agreement provides:

> This agreement and the other agreements are submitted by customers to ITT [Diversified] (for ITT [Diversified's] acceptance or rejection thereof) at ITT [Diversified's] place of business specified at the beginning of this agreement.... *This agreement* and the other agreements and all transactions pursuant thereto *shall be governed* and controlled as to interpretation, enforcement, validity, construction, effect and in all other respects (including, but not limited to, the legality of the interest charged to customers pursuant thereto) *by the laws*, statutes and decisions *of the state of ITT [Diversified's] said place of business.*

Business Financing Agreement, ¶ 16.16 (emphasis added). *See also id.*, ¶ 1.3 (terms not specifically defined "shall have the meaning provided by the Uniform Commercial Code from time to time in effect in the state of ITT Diversified's office specified at the beginning of this agreement."). ITT Diversified's place of business as specified at the beginning of the Business Financing Agreement was Pennsylvania.

The ITT loan was breached and notice of breach was properly issued in May 1983 and not cured. *Id.* Consequently, notice of default sent to Group, Partners, Eastvold, Lacy, Boyd, RAA, Club, and others was properly issued in January 1986. ITT retained the collateral pursuant to the January 27, 1986 notice, at least 9 months before any purported assignment to Pringle.

By the fall of 1981, some dissatisfaction had begun to develop with the Bank of California's performance under the Escrow Agreement with respect to the assignment of the notes to particular accounts and the replacement of notes. In particular, the calculation of the Mortgage Support Account in 1982 presented difficulties. An accounting firm, Alexander & Grant, was hired to review and assist in the preparation of the reports certifying as to the condition of the Mortgage Support Account.

In late 1981 and early 1982, Eastvold, on behalf of Group and Partners, began negotiating with two European time share developers, Jean Marchand and Randolph Rossi (the "Frenchmen") to obtain additional financing. In March 1982, RAA was formed as a Nevada limited partnership, and the Frenchmen formed Marina to act as RAA's general partner. Partners was the limited partner of RAA. Group and Partners intended to assign their rights under the Development Agreement to RAA, an act requiring Club's consent under Paragraph 18 of the Development Agreement.

At all times after March 30, 1982, Group and Partners failed to "maintain coverage" as the Escrow Agreement required.

On April 1, 1982, Partners and RAA memorialized a $4.8 million line of credit from EAB achieved by the good offices of the Frenchmen and secured by a pledge of almost $2.3 million of Member Notes. This line of credit was repaid on August 22, 1986, and the remaining collateral (Member Notes and their proceeds) is the subject of this interpleader. EAB and its collection agent, Oxford Finance Companies, Inc. ("Oxford"), were instructed to hold the interpleaded property on behalf of Group, Partners, and Club in August 1986 after the EAB line of credit had been repaid. All of the notes pledged to EAB were payable on their face to Group and Partners.

Between April 1 and July 3, 1982, over $1 million in Coverage Notes were transferred to ITT and over $3.2 million in Coverage Notes were transferred to EAB. By the end of July 1982, the principal amount of the Coverage Notes was more than $3.4 million less than the amount the Escrow Agreement required. The deficiency in Coverage Notes ranged from $1.44 million in April 1982 to $3.45 million in July 1982. In December 1982, the deficiency was $2.14 million. That deficiency was never cured, and today it is approximately $4.4 million.

In addition, Coverage Notes were transferred to ITT and EAB to replace delinquent Member Notes. Those delinquent

notes were assigned to Club. From February to July 1982 the number of delinquent notes assigned to Club increased over 100%.

The EAB reserve account (lender account 41081) was created in April 1982 to replace delinquent or cancelled Member Notes pledged to EAB. In May and June 1983, despite repeated demands from Club, the EAB reserve account was transferred to EAB. The EAB reserve account contained $825,000 in Coverage Notes. By June 1983, almost $6.3 million in Member Notes had been pledged to EAB, including the EAB reserve account.

In June 1982, Club filed financing statements in Hawaii, Nevada, and California regarding Coverage Notes "as said coverage notes have been and are thereafter changed." In July 1982, Group and Partners agreed to sell a portfolio of notes to Oxford. Oxford held back $625,000 of the purchase price to secure Group's and Partners' obligation to replace delinquent notes.

Also, on August 25, 1982, Partners, Group, and Club entered into a Mortgage Support Agreement, which stated that the EAB Reserve of $959,315.20 was not eligible as Mortgage Support. It further recognized and acquiesced in an assignment by RAA, Group, and Partners of certain notes to EAB from Mortgage Support and provided for a method of restoring Mortgage Support.

Due to the deficiency in Coverage Notes and other disputes with Group and Partners, Club refused to consent to the assignment of development rights to RAA until: (1) Group and Partners executed the First Amendment to Escrow Agreement, which was done on August 24, 1982, (2) RAA assumed the obligations of Group and Partners under the First Amendment to Escrow Agreement, and (3) Group, Partners, and RAA assumed the obligations of Group and Partners and a Second Amendment to Escrow Agreement and a Development Agreement were also executed. These agreements never took effect because the requisite consent of EAB, ITT, Greyhound, and other lenders was never obtained.

During the fall of 1982, Eastvold negotiated to sell substantially all of the assets of Group and Partners (including the interpleaded notes). Partners and Marina entered into Agreements dated August 18, 1982, September 23, 1982, and December 18, 1982 to accomplish the change of control of the developer. In addition, RAA and Partners entered into an Assignment and Assumption Agreement dated November 11, 1982, to which Club consented.

Marina, Group, and Partners executed an Escrow Agreement and Instructions to Escrow Agent dated December 18, 1982 that contemplated the transfer to RAA of substantially all of the assets of Group and Partners in return for RAA's assumption of all the obligations of Group and Partners.

According to Group and Partners, RAA failed to: (1) substitute qualifying collateral under the Side Letter Agreement with Greyhound; (2) replace delinquent notes pledged to ITT; (3) replace delinquent notes sold to Oxford; (4) maintain sufficient coverage notes; (5) pay the mortgages on Club units as they came due, and (6) transfer 16 units in Nice, France to the Club. These failures were considered to be material breaches of both the August 24, 1983 First Amendment to Escrow Agreement with Club and the December 18, 1982 Escrow Agreement and Instructions to Escrow Agent with Group and Partners. Group and Partners issued a Notice of Breach under the Escrow Agreement and Instructions to Escrow Agent on January 24, 1983. Club issued a Notice of Breach under the First Amendment to Escrow Agreement on January 25, 1983.

By this time, the Frenchmen concluded it was time to sound a retreat, and a new player appeared—Boyd, a chiropractor from Texas who had started a streetcorner finance company in 1950 that had grown to become the Credit Plan Corporation. The Credit Plan Corporation had established a line of credit that, in Boyd's view, would permit it to purchase the EAB loan portfolio. Boyd sought to buy either the paper or the company and wanted the terms reduced to a one-page agreement. He was pre-

pared, he testified, to supply an additional $1.5 million in capital.

Marina entered into Agreements dated January 28 and February 1 seeking to transfer development rights to Boyd and "all assets to by [sic] acquired" from Group and Partners pursuant to the December 18 Escrow Agreement and Instructions to Escrow Agents. On February 3, Robert Bilbray, an attorney advising Boyd and all other parties as a result of a waiver agreement ("Bilbray"), advised Boyd of: (1) the default under the Agreement with Oxford, (2) the default under the December 18 Escrow Agreement and Instructions to Escrow Agents, (3) the shortage of Coverage Notes, (4) the breach of the August 24 First Amendment to Escrow Agreement, and (5) the need for a "bulk sale escrow."

Eastvold learned of the Frenchmen's proposed sale of the development rights to Boyd and sought to clarify the position of Group and Partners. To consummate the sale to Boyd, on February 2, 1983, Eastvold, on behalf of Group and Partners, agreed to waive their Notice of Breach. As consideration for this waiver, Marina agreed that a portion of Boyd's purchase price would be paid to Group.

Eastvold further agreed to sign all necessary documents on behalf of Group, Partners, and himself, individually, to fulfill the Marina–Boyd agreement of January 28, 1983.

As a result of the foregoing agreement, Boyd delivered the required promissory notes to Marina, Group, and Partners. In return, on February 4, 1983, Marina, Group, and Partners executed, among other documents, an Amended Certificate of Limited Partnership for RAA, which substituted Boyd's newly created entity, Aloha Resorts International, as General Partner and Boyd as Limited Partner, and an Assignment and Assumption Agreement (Loan and Sale Portfolios). Boyd executed and delivered to Group two notes in consideration of the waiver. Boyd did not execute or agree to be bound by the Escrow Agreement. Group, Partners, and Marina then executed Instructions to Escrow Agent dated February 10, 1982. The Instructions to Escrow Agent provided:

All documents placed in escrow to effectuate this two tier sale shall be held by Kenneth Lacy as escrow agent until they are released by Eastvold and Rossi upon the satisfaction that these agreements have been followed and completed.

The conveyance documents (including an Assignment and Assumption Agreement conveying the interpleaded property) were placed in escrow subject to: (1) publication by Boyd of a Notice of a Bulk Sale and (2) recordation by Boyd of an Amended Certificate of Limited Partnership for RAA. The conditions to closing were never satisfied according to Eastvold and Rossi, and the original Assignment and Assumption Agreement was never delivered to Boyd. Club never consented to the transfer of development rights to Boyd. The Development Agreement and the First Amendment to Escrow Agreement both required such consent.

Club filed additional UCC financing statements in February and April of 1983 to protect its security interest in the Coverage Notes. The April 1983 financing statements specifically included the Member Notes in the EAB reserve account.

After February 1, 1983, Boyd sold Club memberships without forwarding the Member Notes to the escrow agent as the First Amendment to Escrow Agreement required. Instead, Member Notes generated by new sales were transferred to Southwest and subsequently pledged to State Savings & Loan in Clovis, New Mexico. State Savings & Loan was rendered insolvent as a result of its transactions with Boyd, and the Federal Savings & Loan Insurance Corporation ("FSLIC") placed Southwest in receivership. Boyd was advised by letter dated February 9, 1983 that Member Notes could not be sold, transferred, encumbered, or used as security until the breach of the Escrow Agreement was cured.

Boyd performed his obligation to provide notes to the sellers and produced evidence that he had transferred $1.5 million to the Northwest Bank in Fort Worth for RAA's

benefit. By April and May, Club refused to accept new memberships sold by Boyd and Southwest and advised its members not to send payments to Southwest. By late April, it was learned that Boyd was a convicted felon.

Club sought and obtained on June 3, 1983 a temporary restraining order from the United States District Court for the District of Nevada to bar Boyd and Southwest from selling Club memberships or dealing with Member Notes. On June 16, 1983, counsel for RAA and Boyd "entered into a valid stipulation extending the temporary restraining order entered herein on June 3, 1983, indefinitely." On November 28, 1984, counsel for Club, RAA, Southwest, and others stipulated that a preliminary injunction enforcing the TRO would remain in force and be binding on the parties. Marina and Partners sought to enforce the notes given by Boyd in this action, thereby affirming the sale to Boyd.

Group, Partners, and Club notified the Bank of California and its successor servicing agent, Oxford, not to transfer the Member Notes. In addition, Club notified EAB and ITT of Club's claim against the Member Notes pledged to them.

On October 9, 1984, Boyd filed a Third Party Complaint against Club and others in an action Marina brought in Nevada State Court. *Marina Development Corp. v. Joe T. Boyd v. Royal Aloha Vacation Club, et al.*, (Nevada District Court Cause No. A230760) (the "Nevada State Action"). The Boyd Third Party Complaint alleged: (1) breach of the Escrow and Development Agreements by Club, (2) conspiracy to acquire the developer's rights, (3) fraudulent concealment of the Club's notice of breach, (4) fraudulent representations by Club regarding a mortgage on Club units, and (5) interference with Boyd's contract and potential contracts with sales brokers and potential Club members. Pringle knew of the Nevada State Action in the fall of 1986. Summary judgment was entered in favor of Club on November 25, 1987 and now is final. By assignment dated December 15, 1983, Boyd conveyed his interest in the EAB loan portfolio to Credit Plan Corporation.

Pringle, presently employed as a paralegal by his counsel, first came into contact with any of the parties here in connection with an action brought against Southwest early in 1983. Southwest later employed him in 1984 as a Vice President. He first met Boyd in 1985 in connection with a hearing to quash an indictment. Pringle, a lawyer, had been suspended from practice by the Supreme Court of Kansas in 1985 as a consequence of charges unrelated to the present litigation.

A judgment for $23.8 million against Boyd and Credit Plan Corporation and for $26.7 million against Southwest was entered in favor of FSLIC on March 24, 1986. On April 14, 1986, Southwest filed bankruptcy. Pringle consulted with Boyd and Credit Plan Corporation during the action FSLIC brought against Southwest in the fall of 1986. On November 1, 1986, he resigned from Southwest, only to be re-hired three weeks later, at which time he also consulted for Boyd. At the time of his resignation, Pringle had no agreement with Southwest concerning his compensation. Thereafter, in a telephone conversation, it was agreed he would receive an assignment of an interest in the Member Notes held by EAB, ITT, and Greyhound. This agreement was confirmed in a meeting with Boyd. According to Pringle, Boyd transferred the interests because he felt he did not have the time or money to collect on the notes.

According to Pringle, Boyd, individually and on behalf of Credit Plan Corporation, assigned the interpleaded property to Pringle in November 1986. The assignments were dated December 15, 1983 and November 17, 1986 and acknowledged February 19, 1987, although Pringle contends the assignments actually were executed in November of 1986. The purported assignment from Boyd to Credit Plan Corporation was also acknowledged on February 19, 1987 after Credit Plan Corporation's assignment to Pringle. Pringle explains the delayed date of the acknowledgements as

an effort simply to cure an oversight and the pre–1986 assignments as an error.

There is no assignment from RAA to Boyd or Credit Plan Corporation. There is no contemporaneous assignment from Group or Partners to Boyd or Credit Plan Corporation. Thereafter, Pringle demanded and obtained a Quitclaim Assignment from Boyd on behalf of RAA, dated April 6, 1987.

On September 1, 1987, Boyd filed in bankruptcy. On January 14, 1988, Credit Plan Corporation filed in bankruptcy. On June 1, 1988, the Honorable Roger D. Foley, United States District Court Judge for the District of Nevada, entered default judgments in favor of Club for over $14 million against RAA. RAA filed in bankruptcy on May 24, 1988, after the hearing on Club's application for default judgment.

From 1978 to 1982, Club memberships rose to a peak of 12,000. Today Club maintains locations in Spain, Mexico, Hawaii, and Nevada, and there are 10,300 Club members in good standing with rights to vote at Club's annual meeting.

Club, Group, Partners, and Marina have reached an agreement to resolve their competing claims and to share in any recovery of an interest in the Member Notes.

*Conclusions of Law*

This court has jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and 1337(a).

*Club's Security Interest*

The August 27, 1980 Security Agreement, Assignment, and Pledge of Notes executed by Group and Partners constitute a security agreement and grants Club a security interest in Coverage Notes. UCC § 9–203(1)(a).

The Escrow Agreement with the Bank of California, as amended, together with the financing statements filed in June 1982, executed by Group and Partners, constitute a Security Agreement and grant Club a security interest in Coverage Notes. *See In re OPM Leasing Servs. Inc.*, 46 B.R. 661, 670 (Bankr.S.D.N.Y.1985); *In re Modafferi*, 45 B.R. 370, 373 (Bankr.S.D.N.Y. 1985).

■ The Security Agreement and Collateral Assignment of Notes RAA executed on November 11, 1982 constitute a Security Agreement and grant Club a security interest in coverage notes. Club gave value for the security agreements by recognizing the rights of Group and Partners, and subsequently RAA, to sell Club memberships. UCC § 1–201(44).

The Coverage Notes were payable to either Group or Partners, and Group and Partners had rights in the Coverage Notes during 1982. Consequently, Club's security interest attached to the Coverage Notes and is enforceable against the debtor and third parties. UCC § 9–201; *FDIC v. Yates*, 719 S.W.2d 481, 2 UCC Rptr.Serv.2d 1398, 1400 (Mo.App.1986).

The interpleaded property constitutes non-negotiable instruments (and their proceeds) under Article 9 of the UCC. UCC § 9–105(a)(11).

■ Pringle has not received delivery or taken possession of the interpleaded property and cannot take priority over Club's security interest. UCC §§ 9–301, 308; *United Leaseshares, Inc. v. Citizens Bank & Trust Co.*, 470 N.E.2d 1383, 1388–89 (Ind.App.1984). Moreover, Pringle had notice of Club's interest in Coverage Notes prior to November 1986 and would take any assignment subject to Club's security interest. *See Reisdorf Bros., Inc. v. Clinton Corn Processing Co.*, 130 A.D.2d 951, 952, 516 N.Y.S.2d 375, 376 (4th Dep't 1987). The purported assignment did not constitute the sale of inventory in the ordinary course of business. *See Aircraft Trading & Servs. Inc. v. Braniff Inc.*, 819 F.2d 1227, 3 UCC Rptr.Serv.2d 1297, 1304 (2d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 163, 98 L.Ed.2d 118 (1987). Hence an unperfected security interest would take priority over Pringle's claim. UCC § 9–301.

Club perfected its security interest prior to the purported assignment to Pringle. After the EAB loan was repaid, EAB's security interest was extinguished. *See Rozen v. North Carolina Nat'l Bank*, 588 F.2d 83 (4th Cir.1978); *In re Apollo Travel, Inc.*, 567 F.2d 841 (8th Cir.1977). After August 22, 1986, EAB held the interplead-

ed property as a bailee. Club's security interest was perfected from the time EAB, as bailee, received notification of Club's interest. UCC § 9–305. Consequently, Club's security interest was perfected in August 1986, prior to any of the purported assignments to Pringle. *See Pioneer Bank & Trust Co. v. Gilbert*, 526 F.Supp. 602, 603 (N.D.Ill.1979). Club's perfected security interest takes priority over any claim by Pringle. UCC § 9–312.

The description of Coverage Notes in the security agreements is sufficient to make identification of the collateral possible. *Rusch Factors, Inc. v. Passport Fashion Ltd.*, 67 Misc.2d 3, 322 N.Y.S.2d 765, 9 UCC Rptr.Serv. 507, 509–10 (N.Y.Sup.Ct.), *aff'd*, 38 A.D.2d 690, 327 N.Y.S.2d 536 (1st Dep't 1971). All Member Notes transferred to EAB after March 31, 1982, including notes in the EAB reserve account, constitute Coverage Notes. Consequently, all of the interpleaded property except those notes described in the schedule submitted pursuant to Pringle Exhibit 64 constitute Coverage Notes.

■ Club's security interest in the Coverage Notes secures the payment of obligations on units owned by Club. Club is entitled to apply the proceeds of the Coverage Notes included in the interpleaded property to obligations on Club units until either the proceeds are exhausted or the obligations on Club units are satisfied. There currently is a deficiency of $4.4 million in the proceeds available (excluding the Coverage Notes in the interpleaded property) to pay obligations on Club units. As a result, the proceeds of the Coverage Notes included in the interpleaded property will be applied to payment of obligations on Club units.

### Club's Equitable Lien

■ Club also has an equitable lien under the Escrow Agreement on all Member Notes so long as a breach of the Escrow Agreement exists. The Escrow Agreement is an express agreement that all Member Notes not otherwise encumbered secure the obligations imposed on Group and Partners. *See Datlof v. Turetsky*, 111 A.D.2d 364, 365, 489 N.Y.S.2d 353, 354 (2d Dep't 1985); *Pavone v. Aetna Casualty & Surety Co.*, 91 Misc.2d 658, 398 N.Y.S.2d 630, 636 (N.Y.Sup.Ct.1977).

Group, Partners, and RAA breached the Escrow Agreement by failing to maintain coverage from March 31, 1982 to the present. The breach was material and Club properly served notice of breach in January 1983. The breach was not cured and Group, Partners, Club, and RAA have been in default since April 1983.

RAA assumed the obligations of Group and Partners under the Escrow Agreement in the November 11, 1982 Assignment and Assumption Agreement.

RAA had notice of Club's equitable lien. Pringle and his predecessor in interest, Boyd, had notice of Club's claims prior to the purported assignment. Consequently, Pringle has no greater rights than Boyd or RAA and takes the assignment subject to Club's equitable lien. *See Fox v. Vim Elec. Co.*, 156 Misc. 621, 281 N.Y.S. 459 (1935); *Authorized Credit Corp. v. Enterprise Indus. Co.*, 109 N.Y.S.2d 687, 690 (City Ct.1951); 3 S. Williston, *Contracts* § 438, at 252 ("An assignee who takes the assignment with knowledge of the claim against the assigned right ... would everywhere undoubtedly hold the assigned chose in action subject to the prior claim.").

Club's equitable lien applies to all of the interpleaded property until the breaches of the Escrow Agreement are cured. Application of all of the interpleaded property will not be sufficient to cure the existing breaches.

### Club's Constructive Trust

The Escrow Agreement gives rise to the constructive trust in favor of Club to prevent the unjust enrichment of RAA, Boyd, or Pringle in light of the failure of Pringle's predecessors in interest (RAA and Boyd) to pledge sufficient Coverage Notes to Club, pay obligations on Club units as they became due, or transfer sufficient units to Club to service memberships sold between February and June 1983. *See United States v. Augspurger*, 452 F.Supp. 659, 668 (W.D.N.Y.1978); *Coco v. Coco*, 107

A.D.2d 21, 23, 485 N.Y.S.2d 286, 288 (2d Dep't 1985).

■ A constructive trust can be used to recover the interpleaded property from a third person who is not a bona fide purchaser for value. *Harmon v. Harmon*, 126 Ariz. 242, 613 P.2d 1298 (Ariz.App. 1980); Dobbs, *Remedies* § 4.3, at 247. Pringle is not a bona fide purchaser for value and provided no consideration for the purported assignment from RAA. The alleged consulting services were provided only to Boyd and Credit Plan Corporation, entities separate from RAA.

■ Further, Boyd and RAA specifically were enjoined from transferring "contracts and or promissory notes except to the Bank of California" by the injunction in the Nevada Federal Action. The purported assignments to Pringle constitute a "transfer" in violation of the prior injunction. Pringle, although not a party to the Nevada Federal Action, had actual notice of the TRO as an employee of defendant Southwest and Boyd and is bound by the injunction. Nevada Rules of Civil Procedure 65(h). The transaction, therefore, must be deemed invalid and Pringle must be deemed to stand in the shoes of RAA. *Lonergan v. Strom*, 145 Ariz. 195, 200, 700 P.2d 893, 989 (Ariz.App.1985); *Signal Oil and Gas Co. v. Ashland Oil and Refining Co.*, 49 Cal.2d 764, 322 P.2d 1, 11 (1958); *Webb v. Webb*, 375 Mich. 624, 134 N.W.2d 673, 674 (1965); *Fox v. Vim Elec. Co.*, 156 Misc. 621, 281 N.Y.S. 459 (1935).

The rights of Boyd and his successor and assigns under the Escrow Agreement are now *res judicata* by virtue of the Nevada State Action:

> Judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.

*Jackson v. Hayakawa*, 605 F.2d 1121, 1125 (9th Cir.1979), *cert. denied*, 445 U.S. 952, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). The Nevada State courts apply the same rule. *See Water West, Inc. v. Entek Corp.*, 788 F.2d 627, 629 (9th Cir.1986); *Brennan v.*

*Emde Medical Research, Inc.*, 652 F.Supp. 255, 261 (D.C.Nev.1986).

"Ordinarily a judgment is binding on a nonparty who took by transfer from a party after judgment or while suit was pending...." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure*, § 4462 at 548; *see, e.g., Small Business Admin. v. Taubman*, 459 F.2d 991 (9th Cir.1972). "At least as to a transferee who takes with notice of the pending litigation ... the rule is well settled that he is bound by the subsequent judgment." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, § 4462, at 555 n. 21. *See also* Restatement (Second) of Judgments §§ 44, 55 Comment b. Boyd's contract rights under the Club Escrow Agreement already have been determined against him, and Pringle, as assignee, is bound by the earlier determination.

*Group's and Partners' Title*

■ Delivery of property in escrow is of no effect until the conditions of the Escrow Agreement are fulfilled. *Press v. Marvalan Indus., Inc.*, 422 F.Supp. 346, 349 (S.D. N.Y.1976). RAA breached the December 18, 1982 Escrow Agreement and Instructions to Escrow Agent with Group and Partners. The breach was material and was never cured. Consequently, Group and Partners continued to hold all right, title, and interest in the property to be conveyed in the escrow transaction, including the interpleaded property.

■ The Assignment and Assumption Agreement dated February 4, 1983 was deposited in escrow and never delivered to Boyd or RAA. As conditions precedent to closing the escrow, Boyd and RAA were required to: (1) publish a Notice of Bulk Sale, (2) record the Second Amended Certificate of Limited Partnership of RAA, and (3) pay RAA's pre-existing debts. Boyd and RAA failed to satisfy these conditions and, instead, abandoned the escrow. The collateral could not be transferred under an abandoned escrow. *Green v. Huckstep*, 447 S.W.2d 297, 299 (Mo.1969).

Group, Partners, or RAA never transferred to Boyd any rights to the interpleaded property. Nor did Group, Partners, or RAA transfer any rights to the interpleaded property to Credit Plan Corporation. Consequently, neither Boyd nor Credit Plan Corporation had any interest in the interpleaded property at the time of the purported assignments to Pringle in November 1986.

Group or Partners never transferred any of the interpleaded property to Pringle.

The purported Quitclaim Assignment from RAA to Pringle, dated April 7, 1987, only purports to convey the rights, if any, of RAA. RAA had no right to the interpleaded property based upon their failure to satisfy the conditions precedent to close of escrow. Moreover, RAA was enjoined from transferring the interpleaded property.

Pringle is not a bona fide purchaser for value without notice. Pringle had notice of the claims of Club, Group, and Partners and only could take the interpleaded property subject to the rights of Club, Group, and Partners. *Fiberchem, Inc. v. General Plastics Corp.*, 495 F.2d 737, 739 (9th Cir. 1974).

The Assignment and Assumption Agreement was conditioned upon receipt of consent from Club, EAB, and ITT, which was never obtained.

*The ITT Notes*

■ ITT properly retained the Member Notes pledged to it as collateral in satisfaction of the debt of Group and Partners, UCC § 9–505, and Pringle's Cross Claim is to be dismissed.

The Uniform Commercial Code in effect in Pennsylvania provides:

In any other case involving consumer goods or any other collateral *a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation.* Written notice of such proposal shall be sent to the debtor if he has not signed, after default, a statement renouncing or modifying his rights under this subsection. In the case of consumer goods no other notice need be given. In other cases notice shall be sent to any other secured party from whom the secured party has received (before sending his notice to the debtor or before renunciation by the debtor of his rights) written notice of a claim of an interest in the collateral. If the secured party receives objection in writing from a person entitled to receive notification within 21 days after the notice was sent, the secured party must dispose of the collateral under section 9–504. *In the absence of such written objection the secured party may retain the collateral in satisfaction of the obligation of the debtor.*

13 Pa.Cons.Stat.Ann. § 9505(b) (1984) (emphasis added). *See id.*, comment 1 ("The Secured party may keep the goods in lieu of sale on failure of anyone receiving notification to object within twenty-one days.")

The ITT loan was breached and notice of breach was properly issued in May 1983 and not cured. *Id.* Consequently, notice of default sent to Group, Partners, Eastvold, Lacy, Boyd, RAA, Club, and others was properly issued in January 1986. ITT retained the collateral pursuant to the January 27, 1986 notice at least 9 months before any purported assignment to Pringle.

Based upon these findings and conclusions, Club is entitled to judgment dismissing Pringle's claims with costs. Settle judgment on notice.

IT IS SO ORDERED.